## CARBOLIC SOAP CO. v. THOMPSON and another.[1]

(*Circuit Court. E. D. Texas.* November, 1885.)

1. TRADE-MARKS—WORDS DESCRIPTIVE OF NATURE AND QUALITY OF COMPOUND.

    A word that is descriptive of the nature and quality of a compound cannot be claimed and allowed as an exclusive trade-mark.

2. SAME—IMITATIONS OF PACKAGES AND LABELS.

    Parties will be protected from the imitation of their packages so far as they are peculiarly designed and shaped for the purpose of distinguishing their goods; and from the imitation in color, design, style, and lettering combined of the labels used to mark said packages.

In Equity.

Complainants allege that they are proprietors of an article called "Buchan's Cresylic Ointment," an article designed and used as a remedy for cattle affected by the screw-worm, and for other purposes, and that they put it up for sale in peculiar-shaped bottles and distinctive labels, printed in colors, both of which had been used by them and their predecessors in business for upwards of 16 years; that defendants, who had also been largely engaged in the business of selling complainants' goods, had recently put upon the market, and were selling in opposition thereto, another and different kind of ointment represented to be for similar uses, and prepared and put up in imitation of complainants', so as to resemble the same in respect to name, form, and size of packages, labels, and general external appearance, and sold under the general name of "Cresylic Ointment," to the great detriment and injury of the complainants; and they prayed for an account of all sales made by the defendants of the alleged imitation article, that they be condemned to pay over their profits, and for all loss and damage sustained by complainants, and that they be enjoined from using the word "Cresylic," and from using packages, labels, etc., similar to complainants'.

*McLemore & Campbell,* for complainants.

*Hume & Shepard,* for defendant.

PARDEE, J. When the original bill was before the court for a restraining order, and afterwards, when on bill and affidavits the court directed the restraining order to stand over until hearing on the merits, it was considered, on the showing made, as plain that the complainants and their predecessors had adopted as a trade-mark the word "Cresylic," and the particular set of packages and labels described in the bill to identify and distinguish their goods, and had, by energy and outlay, built up a valuable trade; that the defendants were engaged in introducing and selling goods that had purposely been put up in particular packages identical in size and shape, and with closely imitated labels, with the intention of taking advantage of the reputation complainants' goods had acquired, and with the further

[1] Reported by Joseph P. Horner, Esq., of the New Orleans bar.

intention of deceiving purchasers.   At the same time it seemed, from the showing made by affidavits, that, while there was doubt on the subject, the word "Cresylic," claimed as a trade-mark by complainants, was a word arbitrarily and fancifully used by the complainants, not indicative or descriptive of the quality or nature of the article to which it was applied, and therefore a legitimate trade-mark.

Under this state of the case, and distinctly reserving the questions involved until the hearing on the merits, the court allowed the restraining order to stand as an injunction *pendente lite*.   It is deemed proper to make this statement, as counsel in briefs have partly assumed that the merits of the case have been already decided by the court.   Now, on the hearing, the case is submitted upon a mass of evidence taken contradictorily in a suit tried in the supreme court of New York, involving exactly the same issues.   We have examined this evidence carefully, and while there is much conflict as to many facts, and more as to chemical theories, we have no trouble in sifting out a few leading and clearly proven facts, which, in our view, control the case.

1. There is an article—a product of coal tar—known in commerce and in manufactures as "cresylic acid."   Whether among chemists and scientific people this distinctive cresylic acid is regarded as only impure carbolic acid, or crude carbolic acid, or whether it should be called "cresol," "cresylic alcohol," "hydrate of cresyl," "hydrate of oxide of cresyl," "cresylic acid," or "cresylol," is immaterial for this case.

2. This article known in commerce as "cresylic acid" is one of the principal ingredients in the ointment manufactured by the complainants, and called "Buchan's Cresylic Ointment," and in the ointment manufactured by Barnett, and called "Lowe's Cresylic Ointment," and substantially furnishes the said ointment with the curative and valuable properties they have.

3. The word "cresylic," when applied to distinguish an ointment made of soap and the article known in commerce as cresylic acid, is descriptive of the nature and quality of the compound.

4. The manufacturers of Lowe's Cresylic Ointment introduced and sold in Texas by the defendants, and with the design to take advantage of the good reputation and standing of and the public demand for Buchan's Cresylic Ointment, honestly, laboriously, and expensively acquired, and with the design and effect of deceiving the purchasers and consumers of cresylic ointment, have closely imitated the size, shape, form, and appearance of the several packages, and the color, style, and appearance of the labels designed and used by complainants in putting Buchan's Cresylic Ointment on the market.

5. That the imitation of complainants' packages and labels for Buchan's Cresylic Ointment was with the knowledge of, and partly at the suggestion and instigation of, the defendants.

From these facts it follows that the complainants have no right to

the exclusive use of the word "cresylic" as a trade-mark, or to distinguish Buchan's Cresylic Ointment, or any compounds of which the "cresylic acid" of commerce is an ingredient, but complainants ought in equity and good conscience to be protected from the imitation of its packages, so far as they are peculiarly designed and shaped for the purpose of distinguishing complainants' goods, and from the imitation in color, design, style, and lettering combined of the labels used to make said packages, when put on the market; and that complainants ought to be protected, as against the present defendants, from the introduction and sale of all such goods as are put up in such imitated packages, and marked with such deceptive labels. Decree accordingly.