R. HEINISCH'S SONS CO. v. BOKER et al.

(Circuit Court, S. D. New York. March 18, 1898.)

1. UNFAIR COMPETITION—USE OF PROPER NAME—INJUNCTION.
   Defendants, former agents for the firm of R. H.'s Sons, complainant's assignor, which firm enjoyed a high reputation as manufacturers of shears, entered into a contract with one H., a former member of that firm, by which they acquired, among other things, the right to use his name upon all their

goods. H., on withdrawing from the firm, had conveyed to it all his interest in its property, assets, and business; and defendants, in a contract with the firm, had admitted that it was the "sole owner of the H. trade-mark." Defendants at once began to make and sell shears stamped with H.'s name, and packed in a manner similar to complainant's goods, so as to lead the ordinary purchaser (but not, it was claimed, the trade) to believe them the same. At the same time, defendants continued to style themselves, upon signs, in circulars, etc., "agents for R. H.'s Sons." It appeared that nothing had ever been done under any clause of the contract, except that conveying the right to use the name; and the real object appeared to have been solely to acquire, under cover of the other clauses, a claim to that name. *Held*, that the circumstances clearly indicated fraudulent intent, and that complainant was entitled to an injunction against the use of the name, and to an accounting.

**2. SAME—DECEIT OF PURCHASER.**

In a suit to restrain unfair use of a trade-name, the criterion of unfair competition is whether ordinary purchasers, as distinguished from members of the particular trade, are deceived.

**3. SAME—NATURAL CONSEQUENCES OF ACTS.**

Where parties act in such a manner as naturally tends to deceive the public, they must be presumed to have contemplated the natural consequences of their acts.

**4. SAME—ATTITUDE OF COURTS OF EQUITY.**

Courts of equity keep pace with new developments in competition for public favor, and insist that it shall be won only by fair trade.

This was a suit in equity by the R. Heinisch's Sons Company against Carl F. Boker and others to enjoin alleged infringement of a trade-mark, and unfair competition in trade.

Rowland Cox, for complainant.

John J. Gleason, for defendants.

TOWNSEND, District Judge. More than 60 years ago one Rochus Heinisch began the business of making shears and scissors, and shortly thereafter established a factory at Newark, N. J., where said business has ever since been continuously carried on. In 1871 he sold said business to his three sons, Rochus, Jr., Edmund E., and Henry C. Heinisch, who carried it on as co-partners, under the firm name of R. Heinisch's Sons, until 1877, when said Henry C. Heinisch withdrew from the firm, and assigned to it all his right, title, and interest in its property, assets, and business. At that time the parties executed an agreement whereby said firm, complainant's assignors, sold to H. C. Heinisch the stock of goods in the partnership store, and agreed "to sell to the said Henry C. Heinisch all goods or wares manufactured by them, * * * and to turn over and transfer to the said H. C. Heinisch all orders received by them from other quarters for goods of their manufacture." And said H. C. Heinisch agreed "not to sell or manufacture any other goods in the line or of the kind manufactured by the said party of the second part." In 1878 said agreement was assigned to defendants' predecessors, with the consent of the complainant's assignors; and they (complainant's assignors) extended the terms of said agreement for five years, and agreed to manufacture for defendants' predecessors another quality of shears to be known as the "Trenton" brand. In 1883, upon the termination of said agreement, certain disputes arose between the parties, which resulted in an agreement between H. C. Heinisch and defendants' predecessors whereby

he agreed not to engage for 10 years in the manufacture or sale of shears in competition with the business either of complainant's or defendants' predecessors. In 1888 complainant's assignor and defendants executed an agreement which described complainant's assignor as "sole proprietor of the Heinisch trade-mark in cutlery, and manufacture of the same," and constituted defendants their selling agents for four years, unless sooner terminated, and wherein complainant's assignor agreed to furnish his goods to defendants; said goods to be "known and designated as Heinisch quality goods," and "to be stamped with the regular Heinisch name, or with special brands." In 1892 the complainant corporation was organized, and all the rights of said Rochus Heinisch and of said firm were duly assigned to it. Upon the termination of said 1888 agreement, on May 1, 1892, the complainant corporation resumed the sale of the Heinisch goods. June 10, 1892, said H. C. Heinisch made an agreement with defendants to manufacture for and sell to them, as his agents, a certain kind of shears patented by him. Said agreement contained further provisions, as follows:

"Third. The parties of the first part shall have the right to manufacture, or cause to be manufactured, any other kinds or styles of shears or other cutlery which they may desire to make and place on sale, with the name 'H. C. Heinisch,' which words shall constitute a trade-mark, to be duly registered and adopted by the parties as such, which said trade-mark, for all uses and purposes except its use upon said patented shears, shall be the property of and belong to the parties of the first part forever. Fourth. The party of the second part will impart to the parties of the first part any special information he may have or acquire as to the best methods of cutlery manufacture; and, in consideration of the covenants therein contained, he hereby sells, assigns, and transfers to the parties of the first part, all his right, title, and interest in and to said trade-mark, subject only to the agreements herein contained in regard to the said patented tailor's shears. Fifth. In consideration of the covenant on the part of the party of the second part herein contained, the parties of the first part hereby covenant and agree to and with him to pay to him, during his natural life, upon all shears or cutlery upon which they shall use the said trade-mark (other than said patented tailor's shears), a royalty of three per cent. upon the sale price of all such shears sold by them; and after his death they agree to pay to his legal representatives a royalty of one and one-half per cent. upon such sale price of all such shears sold by them, so long as they shall use said trade-mark."

The shears manufactured by said Rochus Heinisch acquired a high reputation in the markets of the world, and said reputation has increased, and is now enjoyed by the complainant. In order to identify his goods, said Rochus Heinisch affixed to them the name "R. Heinisch"; and said name, alone or as part of the name "R. Heinisch's Sons," has been continuously used by his successors in business upon said shears and its labels, and otherwise; and certain distinct boxes, cards, and labels have also been used to identify said goods, which have been known in the markets as "Heinisch Shears." The defendants sell goods, so stamped, boxed, labeled, and advertised under the name "H. C. Heinisch," as to lead the ordinary purchaser to believe that their goods are the goods of complainant. After the termination of said agreement of 1892 with complainant, the defendant for years continued to make use of two signs at the sides of the doorway of their store, having thereon the words "R. Heinisch's Sons," and continued to use postal cards notifying dealers that they were "sole agents for R.

Heinisch's Sons shears." The attempt to explain this conduct as the result of inadvertence on the part of this astute business corporation is more impressive than silence would have been. No such explanation is attempted for the imitation of size, shape, color, collocation, and general appearance of complainant's labels. In view of the previous relations of the parties, it is clear that the acts of the defendants were the result of deliberate attempts on their part to appropriate the business and reputation which belongs to complainant, or of such gross negligence as to disentitle them to the favorable consideration of a court of equity.

The further contention of defendants, that the trade is not misled, if true, is immaterial. It is clear that the devices adopted by defendants deceive ordinary purchasers. The law, firmly established by repeated decisions in this circuit, enjoins every artifice which promotes unfair trade. It is immaterial that professedly innocent individuals contribute to infringe upon the good will of the proprietor, and impose upon the ignorance of the incautious purchaser. A court of equity keeps pace with the rapid strides of the sharp competitors for the prize of public favor, and insists that it shall be won only by fair trade.

The defendants contend that, in any event, they have a right to use the name "Heinisch," or "H. C. Heinisch," upon their goods. H. C. Heinisch sold to complainant in 1877 "all his right, title, and interest in and to all the property, assets, and business of R. Heinisch's Sons." In 1888 the defendants admitted that complainant was "sole proprietor of the Heinisch trade-mark." In 1892 H. C. Heinisch sold his name to them, as a trade-mark. Except for his connection with his patented shears, it does not appear that this transaction represented anything except the purchase of the right to make profit out of the Heinisch trade-name. It is true that the ingeniously worded contract purported to provide that H. C. Heinisch should impart "any special information he may have or acquire as to the best methods of cutlery manufacture." But said contract further gave to defendants the right to manufacture any kind of "cutlery which they desire to make and place on sale with the name 'H. C. Heinisch,'" and provided that said name should be "the property of and belong to the parties of the first part forever." In fact, defendants' goods were manufactured for them, according to the order of their manager, Hawkins, by the firm of Clayton Bros., at Bristol, Conn. H. C. Heinisch never had any communication with said manufacturers, and said shears were not made under his instructions or directions, but said Hawkins "had entire control of the manufacture." They were, however, stamped, boxed, labeled, and sold under the name "H. C. Heinisch," so arranged as to simulate the original Heinisch goods. When H. C. Heinisch made this contract, in 1892, allowing the perpetual use of his name, all that he did was to look at some samples of the goods which defendants were to have manufactured for them, and to express his satisfaction with them, as he considered them equal, if not superior, to the original Heinisch goods. Although ostensibly the chief object of said agreement was to secure the right to the H. C. Heinisch patent, not a single pair of tailor's shears has ever been manufactured under said patent. Judging from the conduct of defendants, the actual object of said contract was to appropriate the reputation of

the Heinisch shears by the purchase of the name "H. C. Heinisch," which, as a "trade-mark for all uses and purposes, except its use upon said patented shears, shall be the property of and belong to the parties of the first part forever." This is not the case of a sale of a good will in connection with a plant or a growing business. H. C. Heinisch had sold all his "right, title, and interest" in the Heinisch business in 1871; and defendants in 1888 had admitted that plaintiff's assignors were "sole proprietors of the Heinisch trade-mark." Nor is this a case where the party allowing the use of his name on certain goods has associated himself in business with the manufacturers thereof. It does not appear that H. C. Heinisch ever invested any money in said business, or undertook any supervision over, or exercised any skill in, the manufacture of said goods. It thus appears that, while neither of the ostensible objects of said contract has been carried out, the Heinisch name, attempted to be sold thereunder, has been so used as to deceive the public. In these circumstances, it must be presumed that the defendants contemplated the natural consequences of their acts, irrespective of those carefully worded provisions of said contract which apparently were never intended to have any effect. The complainant is therefore entitled to an accounting, and to an injunction restraining the use of the name "Heinisch," or "H. C. Heinisch," on defendants' shears (other than said patented shears), labels, postal cards, and otherwise, in any way which will interfere with complainant's enjoyment of the benefit of its trade-name. The form of the decree will be determined after submission of proposed forms by counsel.