[No. 12078.   Department Two.   April 17, 1915.]

PACIFIC COAST CONDENSED MILK COMPANY, *Respondent*, v.
FRYE & COMPANY, *Appellant*.[1]

TRADE-MARKS AND TRADE-NAMES — UNFAIR COMPETITION — IMITA-
TION.  Fraud amounting to unfair competition by the confusion of
things used in the label of another which through such other's prior
use had come to connote a particular thing, depends upon whether
the same would be reasonably calculated to deceive the common or
usual purchaser of the given article when exercising ordinary care.

TRADE-MARKS AND TRADE-NAMES—UNFAIR COMPETITION—IMITATION
—LABELS AND COLORS.  Unfair competition in the use of a similar
label for a like article of goods, sufficient to warrant injunction, is
not shown by the fact that plaintiff for a number of years had on the
market a condensed milk known as "Carnation Brand Sterilized
Evaporated Milk," and that the defendant later put out an article
known as "Wild Rose Brand Sterilized Milk," when the specific
points of resemblance in the labels are that both are made of the
same colors of red and white in bands of uniform width with their
relative positions reversed; that the central group of one consists
of a bunch of three carnations and the other of three wild roses,
and that there is a resemblance in number, size, arrangement and
relative position of the several parts and words and in the colors in
which the same are represented, excepting that the title "Carnation"
is in script type and that of "Wild Rose" in Roman; since there is
no *idem sonans* in the names, and similarity in the color scheme
alone is not sufficient to constitute an infringement; especially where
there was no evidence that dealers or consumers had been deceived
by the similarity in color and design.

TRADE-MARKS AND TRADE-NAMES—UNFAIR COMPETITION—IMITATION
—DECEPTION OF PUBLIC.  Although a label for a competing article
of goods may manifest a similarity in color scheme and grouping
which might be characterized as ethically questionable, yet where
the differences are so prominent as to negative a design to deceive
an intending purchaser of ordinary intelligence using reasonable
caution, and there is no evidence of a single person having been de-
ceived, the burden being on plaintiff to establish that fact, the use
of such label will not be enjoined.

Appeal from a judgment of the superior court for King
county, Albertson, J., entered October 18, 1913, in favor of

[1]Reported in 147 Pac. 865.

the plaintiff, in an action to enjoin the use of a trade label as unfair competition, tried to the court.  Reversed.

*Higgins & Hughes* (*Hyman Zettler*, of counsel), for appellant.

*Peters & Powell*, for respondent.

Ellis, J.—This is an action to enjoin, as unfair competition, the use of a label upon containers of condensed milk. The plaintiff and its predecessors have, for about fifteen years, manufactured and marketed its "Carnation" brand of evaporated milk, using a label of sufficient length and width to practically cover the surface of the can, with equal horizontal bands of red and white, the red above and the white below.  In the middle is a group of three carnation flowers, two red, resting on the white background, and one pink, resting on the red background; with the word "Carnation" in prominent cursive script in white on the red background running in a straight line above the flowers, and the word "Brand" immediately under the word "Carnation," in small green letters.  Immediately under the group of carnations, in small red letters, are the words "Sterilized Evaporated," and in large green letters, the word "Milk," below which, in small red letters, are the words "An Unsweetened Condensed Milk."  These, as the major characteristics, are placed in the middle of the label, and are flanked on either side by a torch, one-half in red extending into the white band, and the other half in white extending into the red band.  On either side, outside of these torches, are groups of printed matter containing a guaranty and directions.  Across the top of the label in the red band is a row of white conventional fleur-de-lis, and along the bottom in the white band a similar row in green.

The defendant is a meat packer, and also operates a group of retail markets in the state of Washington where meats and other supplies are sold.  For more than eighteen years it has used the name "Wild Rose," together with a design

of the rose in one form or another, on various articles as its brand. A few months before the commencement of this action, it determined to enter the competitive field for the selling of evaporated milk, and adopted a label of the same size, shape and color as that of the plaintiff, with the red band below and the white above, thus reversing the plaintiff's color scheme. The defendant's central figure is a cluster of three wild roses, the stems in white and green resting on the red background, the flowers pink, resting upon the white background. Above the group of flowers are the words "Wild Rose," in prominent upright Roman letters, red in color, forming an arch. Immediately beneath it appears the word "Brand" in green letters. Immediately beneath the group of roses and in the red background appears the word "Sterilized" in small white letters, and immediately beneath that, the word "Milk" in prominent white letters. Flanking the entire figure on either side, instead of the plaintiff's torches, appear two upright scepters, one-half in the white background and the other half in the red background. Outside of these, on either side, appears printed matter wholly different from that similarly placed on plaintiff's label. The defendant's label is not bordered with the fleur-de-lis, but along the bottom of the red band it is bordered with alternating long dashes and round white dots, each edged with a crescent of green.

The case was tried on affidavits and certain stipulated facts. The affidavits on behalf of the plaintiff were made by its president and secretary. The gist of that of the president is as follows:

"Condensed milk is for the most part sold through the channels of the grocery trade, wholesale and retail. Prior to engaging in the manufacture of condensed milk I was for many years engaged in the retail and wholesale grocery business, and am familiar with the habits of retail purchasers in the matter of selecting and indicating goods by reference to distinctive labels, and I know how readily confusion and deception in trade may arise from similarity of labels and trade-marks. I have no hesitation in saying that the Wild

Rose label as described in and shown by the exhibit annexed to the complaint herein might readily deceive the average purchaser at retail, and could easily be used by dealers in palming off goods so labeled upon incautious and illiterate buyers as for Carnation Milk. The injury to plaintiff's business is intensified by the reason that defendant's milk is much inferior in quality to plaintiff's product, which inferiority will, to those users not noticing that they are not getting plaintiff's product, result in leading them to think that plaintiff is not maintaining the standard of its product and will cease to buy it."

The affidavit of the secretary was to the effect that he believed the allegations of the complaint to be true.

The affidavits on behalf of the defendant were those of its president, secretary and purchasing agent, to the effect that the name "Wild Rose," with the design of a rose or roses, had been used by the defendant and its predecessor for more than eighteen years, especially on lard of the highest quality; that after careful consideration in seeking for a label which would be appropriate for condensed milk, they found the colors theretofore used by the defendant, red and black, were not suitable for a light product such as milk; that the color combinations most generally used on condensed milk or similar products are white and red or white and blue; that the probably attractive combinations are very few; that it is impossible to secure a trade-mark from either the state or the Federal governments upon any design or combination of colors by reason of their common use; that any attractive design or combination of colors would be certain to present points of great similarity to some other label already in use; that affiants considered red and white more attractive than blue and white, and made their design, therefore, as distinctive and different from the plaintiff's and other manufacturers' using the same combination as ingenuity could accomplish, not with the view to any confusion, but to avoid such confusion, and to make defendant's milk, under its well

known Wild Rose brand, as distinctively different as possible. There were also affidavits of six managers of the defendant's retail markets in the state of Washington and of fifty-four retail grocers and general merchandise dealers throughout the state located in some twenty different towns and cities, as follows:

"That each of them has been handling 'Wild Rose' milk for periods averaging from one to six months; that they each for a long time past also handled 'Carnation' milk; that not a single one of affiants has ever known of a single instance of a retail purchaser or any one else who was deceived by any similarity in the labels of 'Wild Rose' and 'Carnation' brands or who mistook one for the other, or who was confused into buying or offering to buy one of the brands for the other; that the 'Wild Rose' and 'Carnation' labels are as different as many other styles of labels on independent brands of goods; that retail purchasers habitually distinguish between and call for brands of canned goods they want by name; that in the judgment of affiants there is no likelihood of any retail purchaser's being deceived by the label into purchasing 'Wild Rose' for 'Carnation'."

There is also an affidavit of defendant's secretary that the affidavits above mentioned were those of all the dealers who have handled the Wild Rose brand, except six or eight who were absent from their places of business when called upon or were located at places so remote that they could not be reached at the time of hearing.

The stipulated facts were to the effect that the defendant's Wild Rose label more nearly approached the plaintiff's Carnation label than any label of any other competitor save one which had been abandoned at plaintiff's instance, that defendant's Wild Rose brand contained on the average about five and eight-tenths per cent of butter fat, while the plaintiff's Carnation brand contained not less than seven and eight-tenths per cent of butter fat, and that the Wild Rose milk has usually been sold on the market at a lower price than the Carnation milk.

The court entered a decree enjoining the defendant from using the Wild Rose label or any other label as closely resembling the Carnation label. The defendant appealed.

Irrespective of technical trade-marks, courts have long recognized the right of the first user of a distinctive dress of goods to protection against use by another of a similar dress or name in unfair competition. The basic principle of the doctrine of unfair competition, though variously expressed, is exceedingly simple. It is just this—no dealer or manufacturer has the right by any name, mark, sign, label, dress or other artifice, to represent to the public that the goods sold by him are those manufactured or produced by another, thus passing off his goods for those of such other to the latter's injury. *Rathbone, Sard & Co. v. Champion Steel Range Co.,* 189 Fed. 26; *Coats v. Merrick Thread Co.,* 149 U. S. 562; *Sterling Remedy Co. v. Spermine Medical Co.,* 112 Fed. 1000; *Schmidt v. Brieg,* 100 Cal. 672, 35 Pac. 623, 22 L. R. A. 790.

Innumerable cases stating this principle in some form might be cited. The whole doctrine rests on the prevention of fraud by the confusion of *things* through use of a label or dress which by another's use has come to connote a *particular thing.* *Perlberg v. Smith,* 70 N. J. Eq. 638, 62 Atl. 442. The difficulty in such cases lies not in determining the governing principle—that is invariable and runs through all of the cases,—but in applying that principle to the facts of a given case. For this purpose an examination of a multitude of decisions leads us to the conclusion that no rule, other than a very broad one, can be stated. A resemblance which would deceive an expert or very cautious purchaser may still give a right of action, but a resemblance which would deceive only an indifferent or careless purchaser gives no right of action. The true rule lies between these extremes, condemning what would be reasonably calculated to deceive the common or usual purchaser of the given article

when exercising ordinary care. As said in *Allen B. Wrisley Co. v. Iowa Soap Co.*, 122 Fed. 796, 798:

"The line of demarcation between acts indicative of a lawful and of an unlawful intent here runs wide and clear between those which would not and those which would be likely to induce the common purchaser, when exercising ordinary care, to buy the article of the vendor as the product or property of his competitor. The duty is imposed upon every manufacturer or vendor to so distinguish the article he makes or the goods he sells from those of his rival that neither its name nor its dress will probably deceive the public or mislead the common buyer. He is not, however, required to insure to the negligent or the indifferent a knowledge of the manufacture or the ownership of the articles he presents. His competitor has no better right to a monopoly of the trade of the careless and indifferent than he has, and any rule of law which would insure it to either would foster a competition as unfair and unjust as that promoted by the sale of the goods of one manufacturer as those of another. One who so names and dresses his product that a purchaser who exercises ordinary care to ascertain the sources of its manufacture can readily learn that fact by a reasonable examination of the boxes or wrappers that cover it has fairly discharged his duty to the public and to his rivals, and is guiltless of that deceit which is an indispensable element of unfair competition."

Even in trade-mark cases where the fact of infringement is in issue, the same broad rule applies. We find it nowhere better stated than by Mr. Justice Clifford in *McLean v. Fleming*, 96 U. S. 245, 255:

"Colorable imitation, which requires careful inspection to distinguish the spurious trade-mark from the genuine, is sufficient to maintain the issue; but a court of equity will not interfere, when ordinary attention by the purchaser of the article would enable him at once to discriminate the one from the other. Where the similarity is sufficient to convey a false impression to the public mind, and is of a character to mislead and deceive the ordinary purchaser in the exercise of ordinary care and caution in such matters, it is sufficient to give the injured party a right to redress, if he has been guilty of no laches."

See, also, *Coats v. Merrick Thread Co., supra; Bulte v. Igleheart Bros.*, 137 Fed. 492; *Hubinger Bros. Co. v. Eddy*, 74 Fed. 551; *American Tobacco Co. v. Globe Tobacco Co.*, 193 Fed. 1015.

An examination of the complaint makes it plain that the gravamen of the charge in this case is an alleged imitative color scheme. It is the one specific feature emphasized throughout. It is averred, in substance, that the appellant, intending to imitate the respondent's label and to take unfair advantage of the wide reputation of respondent's label and product, has used a label of white and red parallel stripes, the red below and the white above, reversing the relative positions of the stripes as used by respondent. The specific points of resemblance are set out as follows:

"(1)   In the two bands, one red and the other white, of uniform width, so placed upon containers that the upper half presents one color and the lower half the other color.

"(2)   In the number, size, arrangement and relative position of the several parts and words of the central figure and in the colors in which the same are represented.

"(3)   In the number of groups or paragraphs of printed matter outside of the central figure and in their position with relation to each other and to the central figure.

"(4)   In the use of green lettering upon the white band and white lettering upon the red band."

It is then averred that this resemblance, "and especially the substantial identity in color scheme and arrangement of major characters, causes such confusion as to mislead the ordinary intending purchaser." That the color scheme is the chief offending element is further emphasized in the prayer for an injunction against the use by the appellant of "any label for milk of any kind which bears red and white bands such as shown on the foregoing label." An examination of the two labels makes it evident that if the claim of unfair imitation is sustained at all, it must be almost entirely upon appellant's use of the red and white colors. The names "Wild Rose" and "Carnation" neither sound alike nor look

alike.   In lettering, the two names are wholly dissimilar. Their only common point is that both are names of flowers. This can hardly constitute an actionable resemblance, especially since the appellant had adopted and given a vogue to the Wild Rose as a brand of its own for other goods long prior to the adoption of the name "Carnation" by the respondent's predecessor.   The colors of the two groups of flowers are as dissimilar as possible, so long as both are meant to simulate the true colors of the respective flowers. While on each side of the central group on each label is a column of printed information, the wording and the substance of the one is entirely different from that of the other. The most prominent thing in this side matter of appellant's label is the name "Wild Rose Brand Sterilized Milk" and "Frye & Company."   In that of respondent's it is respondent's name, "Pacific Coast Condensed Milk Co."   The two really distinguishing features, the name of the brand and the name of the owner, neither of which bears the slightest resemblance to that of the respondent, are set out in appellant's label more prominently than anything else.   It is not claimed that the words "sterilized milk" are anything more than truly descriptive matter incapable of exclusive appropriation.   Similarity in colors and general arrangement are often held material factors in aiding deceit, but in a majority of the adjudicated cases the names used in connection therewith approach an *idem sonans. Enoch Morgan's Sons Co. v. Whittier-Coburn Co.,* 118 Fed. 657 ; *McLean v. Fleming, supra; Sterling Remedy Co. v. Spermine Medical Co., supra; Bauer & Co. v. La Societe Anonyme etc.,* 120 Fed. 74 ; *Drewery & Son v. Wood,* 127 Fed. 887 ; *Carbolic Soap Co. v. Thompson,* 25 Fed. 625 ; *Franck v. Frank Chicory Co.,* 95 Fed. 818 ; *Von Mumm v. Wittemann,* 85 Fed. 966 ; *Centaur Co. v. Link,* 62 N. J. Eq. 147, 49 Atl. 828.

Here, however, there is no hint of *idem sonans* in the names. The names being wholly different, sounding differently, and printed prominently in different colors and type, and the

symbols being different with no marked resemblance other than that necessitated by the nature of the flowers, it is manifest that, but for the appellant's use of the red and white bands, no plausible claim of unfair competition could be advanced. But similarity in color alone is not sufficient to constitute an infringement. The primary colors are few, and, as the evidence shows, those suitable for light products, such as milk, are even more limited. To allow them to be appropriated as distinguishing marks would foster monopoly by foreclosing the use by others of any tasty dress. It has frequently been held that as a rule, subject to certain exceptions when used in connection with other characteristics, a color cannot be monopolized to distinguish a product.

"The primary colors, even adding black and white, are but few. If two of these colors can be appropriated for one brand of tipped matches, it will not take long to appropriate the rest. Thus, by appropriating the colors, the manufacture of tipped matches could be monopolized by a few vigilant concerns, without any patent whatever. Indeed, it is customary for a large company like the defendant to issue many brands of matches, with heads of different colors. It is now making tipped matches. If, by appropriating two colors for each brand, it could monopolize them, it would soon take all the colors not in use by the complainant, and thus cover the entire field at once. For these reasons, we think the court below was in error in holding that the complainant had appropriated the colors of red and blue for the head of its tipped matches." *Diamond Match Co. v. Saginaw Match Co.,* 142 Fed. 727.

See, also, *Philadelphia Novelty Mfg. Co. v. Rouss,* 40 Fed. 585; *American Tobacco Co. v. Globe Tobacco Co., supra; New Orleans Coffee Co. v. American Coffee Co.,* 124 La. 19, 49 South. 730; *Fleischmann v. Starkey,* 25 Fed. 127; *Davis v. Davis,* 27 Fed. 490; *Newcomer & Lewis v. Scriven Co.,* 168 Fed. 621; *Mumm v. Kirk,* 40 Fed. 589; *Regensburg & Sons v. Juan F. Portuondo Cigar Mfg. Co.,* 142 Fed. 160; *Heinz v. Lutz,* 146 Pa. St. 592, 23 Atl. 314; Browne, Trademarks (2d ed.), §§ 271 and 272.

The case of *Nokes v. Mueller,* 72 Ill. App. 431, does not hold to the contrary, but merely emphasizes the exception. In that case the corresponding parts of the rival milk wagons were painted in precisely the same colors, and other characteristics, such as a picture of two cows, a running brook and the inscriptions, were substantially the same. Moreover, the evidence there indicated that some persons were actually deceived. Undoubtedly in cases where simulation is not only so plain as to show an indisputable intention to deceive, and is on its face obviously calculated to deceive, injunctions have been and should be issued without evidence of specific instances of actual deception. *Von Mumm v. Frash,* 56 Fed. 830; *R. Heinisch's Sons Co. v. Boker,* 86 Fed. 765; *Lalance & Grosjean Mfg. Co. v. National Enameling & Stamping Co.,* 109 Fed. 317; *New England Awl & Needle Co. v. Marlborough Awl & Needle Co.,* 168 Mass. 154, 46 N. E. 386, 60 Am. St. 377; *Dutton & Co. v. Cupples,* 102 N. Y. Supp. 309; *Boker v. Korkemas,* 122 App. Div. 36, 106 N. Y. Supp. 904; *Drake Medicine Co. v. Glessner,* 68 Ohio St. 337, 67 N. E. 722; *Burnett v. Hahn,* 88 Fed. 694; *Kostering v. Seattle Brewing & Malting Co.,* 116 Fed. 620.

But, again, in most of such cases there is found an *idem sonans* in name, in addition to color and arrangement of parts on the label or a close imitation in other particulars. We have been cited to but one case, where an injunction was granted, in which the color and arrangement of the offending label was not much more imitative than that complained of here, but in that case the color and type of the names "Fairbanks" and "Buffalo" were similar. *Fairbank Co. v. Bell Mfg. Co.,* 77 Fed. 869.

In that case, moreover, there was proof of specific instances of deception. No such evidence is found here. On the contrary, some fifty-four retail dealers who handled both brands of condensed milk made affidavit that they had never known of a single instance of a retail purchaser or any one else being deceived. True, these dealers had only been

handling the Wild Rose brand from one to six months, but it is evident that if purchasers were ever likely to be deceived, it would be at the start rather than later when the new brand had become better known. As said by the supreme court of Pennsylvania in *Heinz v. Lutz*, 146 Pa. St. 592, 23 Atl. 314, 315:

"It is not enough that there may be a possibility of deception. The offending label must be such that it is likely to deceive persons of ordinary intelligence. It is not necessary to show that persons have been deceived, yet the finding of the master that no one has been deceived, although defendant's label has been in use for some time in the same vicinity as that of the plaintiff's is certainly strong evidence in support of defendants' allegation that their label is not likely to deceive."

See, also, *Kann v. Diamond Steel Co.*, 89 Fed. 706.

The same rule also prevails in England: *London General Omnibus Co., Ltd., v. Lavell*, 1 Chan. Div. (1901) 135; *Payton & Co. v. Snelling, Lampard & Co.*, (1901) Appeal Cases, 308. The last case cited involved competitive brands of coffee, one under the name of "Royal Coffee," and the other under the name "Flag Coffee," the latter contained in canisters with labels of colors which it was claimed were calculated to deceive. Lord Mcnaughten said:

"In the next place, it is perfectly clear that no human being has been deceived. There is not a single instance of any person wishing to buy 'Royal Coffee' buying 'Flag Coffee' instead through any mistake of any sort. Mr. Warmington accounted for that by saying, 'Oh, we were bound to institute proceedings at the earliest possible moment;' but if persons come to the court under an apprehension of that sort they are still bound to make out their case. It will not do to say, 'We were frightened by what might happen, and, therefore, you must stop the thing *in limine*.'

"The third thing which is perfectly clear on the evidence is this: that as regards the plaintiff's goods, if they have acquired a title and denomination in the market, the only title and denomination which they can have acquired is that

of 'Royal Coffee,' while as regards the defendant's goods, if they have acquired or should acquire a title in the market, it is or will be the title of 'Flag Coffee'."

So here, there is no evidence that a single person has been deceived, and it seems clear that if the appellant's goods are ever to gain a title in the market it must be as "Wild Rose" milk, and it will not and cannot be as "Carnation" milk. While there is in the case before us a manifest similarity in color scheme and grouping which could not be the result of mere coincidence, but evidences a design to imitate and appropriate respondent's taste in dress, which is not to be commended and may be justly characterized as ethically questionable, the differences are so many and so prominent as to negative a design to so imitate as to deceive by confusing identity or origin. The appellant's label could not deceive an intending purchaser of ordinary intelligence using reasonable caution, which is after all, both on reason and authority, the only practical test.

As said in *Perlberg v. Smith, supra:*

"Care must be taken in these cases not to extend the meaning of the word 'unfair' to cover that which may be unethical but is not illegal. It may be unethical for one trader to take advantage of the advertising of his neighbor, but his so doing would in many instances be entirely legal."

And as said in *Allen B. Wrisley Co. v. Iowa Soap Co.,* *supra:*

"Deceit is the basis of suits of this character. The intention to palm off one's goods as those of another, and the use of suitable means to effect that intention, are both essential elements of a good cause of action for unfair competition. The intention alone, without the actual or probable use of means calculated 'to convey a false impression to the public mind, . . . and to mislead and deceive the ordinary purchaser,' furnishes no ground for relief, because an intent to injure where no injury is or will be inflicted, causes no legal damage."

The burden of proof was upon the respondent. From an inspection of the labels, we cannot say that that of the appellant is reasonably calculated to deceive. The uncontradicted evidence shows that no one has been deceived.

The judgment is reversed.

FULLERTON, CROW, MOUNT, and MAIN, JJ., concur.