[No. 18832. *En Banc.* June 15, 1925.]

Seattle Taxicab Company, *Appellant,* v. Oliver De Jarlais *et al., Respondents.*[1]

Actions (24)—Injunction (47)—Joinder of Causes — Parties and Interests Involved—Defendants. In an action for an injunction against unfair competition, in which no damages are asked, plaintiff may join as defendants all whose independent acts unite, as their common result, in an invasion of plaintiff's rights, although the several defendants had no common design or concert of action.

Trade-marks and Trade-names (1)—Marks and Names Subject of Ownership—Similarity of Colors—Injunction. Injunction lies to prevent the operation of a yellow taxicab so painted as to imitate the plaintiff's cabs in a manner likely to deceive plaintiff's patrons, where the plaintiff had adopted the name "Yellow Cab" and a distinctive color, and had a well established business, built up on a reputation for the superior service of its "yellow" cabs (Parker, J., dissenting).

Appeal from a judgment of the superior court for King county, Griffiths, J., entered March 8, 1924, dismissing an action for an injunction, after a trial on the merits to the court. Reversed.

*Bogle, Merritt & Bogle,* for appellant.

*G. F. Vanderveer,* for respondents.

Tolman, C. J.—Appellant, a Washington corporation, engaged in the taxicab business in the city of Seattle, brought this action against the respondents, as defendants, seeking an injunction against, and damages for, unfair competition. A demurrer having been

[1] Reported in 236 Pac. 785.

interposed to its complaint, by leave of court the plaintiff struck therefrom all allegations as to damages, and also the prayer for an accounting and a money judgment. The demurrer was then overruled, the defendants answered, and the case proceeded to trial on the merits to the court, resulting in a judgment denying injunctive relief and dismissing the action, from which the plaintiff prosecutes this appeal.

Following in the main the allegations of the complaint, the evidence offered on behalf of the appellant tends to show that it has been engaged in the taxicab business in the city of Seattle since the spring of 1919, during all of which time it has used high-grade vehicles, employed competent and courteous drivers, and charged low and uniform rates. By reason of these facts and the general excellence of its service, it has acquired a widespread reputation for reliability and satisfactory service at fair rates. From the beginning of its enterprise, appellant, in order to identify and distinguish its cabs from those of others engaged in the same business, has adopted and used an original and distinctive design or dress for its cabs, consisting chiefly in the body of the cab being painted yellow, the top, hood, fenders, wheels, lights, frame, radiator and chassis black, the moulding strips to the doors, both front and rear, and two narrow strips running vertically around the rear panel of the body being painted black, and all of its cabs having a uniform inside finish. The striking and predominating feature of the design of appellant's cabs was and is the yellow color. This design has been used continuously since the spring of 1919, and appellant has added to the number of its cabs until it now has in operation a large fleet so finished. Appellant has also been using the names "Yellow Cab" and "Yellow Cab Company" to identify its cabs and its business, and has expended large sums

of money in advertising its business in Seattle, in other Pacific Coast cities, and throughout the east where tourist traffic originates, featuring the yellow cab idea in all such advertising. It is not disputed that appellant now has a large amount of money invested in its equipment, and employs about 100 persons regularly.

About April or May, 1923, the respondents, who had previously been operating Dodge taxicabs in the city of Seattle, repainted and refinished their three cabs with yellow bodies, black fenders, hoods and chassis, two of them at least having brown tops, and none of them being decorated by the narrow black moulding strips as in the case of appellant's cabs. It is alleged, and the evidence tends to show, that the colors, design and finish of the respondents' cabs were so similar to that of appellant's cabs as to be calculated to, and that they actually did, deceive ordinary users, patrons of the appellant, and the public generally, and that respondents charged higher rates, thus causing persons deceived to blame appellant unjustly for making unfair charges. It is appellant's contention, to which its evidence lends support, that these acts of the respondents were with full knowledge of the design and finish of appellant's cabs, and were undertaken with the deliberate and fraudulent intention to so imitate appellant's cabs as to avail themselves of its reputation, business and good will, with the intentional effect and result that respondents' cabs would actually be mistaken for and used by appellant's patrons and the public generally as the appellant's cabs.

Respondents, by answer, admitted that appellant's taxicabs were finished substantially as described in its complaint, admitted that respondents owned and operated for hire cars the bodies of which were formerly painted other colors, but are now painted a shade of yellow slightly differing from the shade of yellow

used by appellant; but denied that their cabs were
similar in dress to the cabs of appellant, and denied
practically all of the other allegations of the complaint,
and by their testimony point out many things which
they claim to be distinguishing features; deny the use
of the name "Yellow Cab" or "Yellow Cab Company,"
or any representation that their cabs, or either of them,
was such a yellow cab, and variously account for the
change of color in their cabs, one saying that by experi-
ence he had found yellow to be a very durable color;
another testifying that he was fond of yellow because
a yellow dog once saved his life; but all admitting, at
least tacitly, that a striking color which could be dis-
tinguished at a considerable distance was an advan-
tage in their business as differentiating for hire cars
from private cars; and while in terms denying it, more
or less directly, it was apparent from the testimony
of each respondent, taken as a whole, that the change
of color was adopted for the purpose of increasing
revenue from his car; but whether such increased
revenue was to be derived through a deliberate and
fraudulent intention to imitate appellant's cabs and
thus avail themselves of the reputation and good will
of the appellant is a matter for deduction. Other facts
will appear more fully as we proceed.

The first point to be disposed of is the question of
misjoinder of parties defendant and of causes of ac-
tion.    Respondents cite and rely upon § 296, Rem.
Comp. Stat. [P. C. § 8380], which provides:

"The plaintiff may unite several causes of action in
the same complaint, when they all arise out of,—

.    .    .    .    .    .    .    .    .    .    .

"But the causes of action so united must affect all
the parties to the action,    .    .    .    and must be separ-
ately stated."

It is contended that the appellant nowhere charges any concert of action between the several defendants (respondents here), and that the evidence clearly shows that each one acted independently of the others. This objection was, no doubt, good as to the complaint as originally drawn, but the striking of the allegation of damages and the prayer for relief with reference thereto brings the case, we think, within the general rule stated in 30 Cyc. 129, as follows:

"However wide this liberty of joinder, it does not annul the general principle that when a plaintiff asserts claims against two or more persons in respect of their several liabilities for separate wrongs, he cannot sue these persons as co-defendants. The distinction is marked in the difference between an action for an injunction and an action for pecuniary damages when both actions turn upon an injury arising out of the acts of different defendants between whom there has been no common design or concert of action, but whose independent acts have in fact united, as their common result, in an invasion of plaintiff's rights. When plaintiff seeks an injunction against the continuance of this common result, he may join all the defendants in one action. But when he sues to recover his damages because of his injury from these separate, independent wrong-doers, he cannot join them as defendants in one action."

This rule seems to be supported by great weight of authority and we are satisfied to adopt it.

We now come to the more serious and more hotly contested issue as to the right to injunctive relief.

The principle which appellant here invokes is not a new one to this court. As was said in *Pacific Coast Condensed Milk Co. v. Frye & Co.*, 85 Wash. 133, 147 Pac. 865:

"Irrespective of technical trade-marks, courts have long recognized the right of the first user of a distinctive dress of goods to protection against use by another

of a similar dress or name in unfair competition. The basic principle of the doctrine of unfair competition, though variously expressed, is exceedingly simple. It is just this—no dealer or manufacturer has the right by any name, mark, sign, label, dress or other artifice, to represent to the public that the goods sold by him are those manufactured or produced by another, thus passing off his goods for those of such other to the latter's injury. (citing cases.)

"Innumerable cases stating this principle in some form might be cited. The whole doctrine rests on the prevention of fraud by the confusion of *things* through use of a label or dress which by another's use has come to connote a *particular thing. Perlberg v. Smith,* 70 N. J. Eq., 638, 62 Atl. 442. The difficulty in such cases lies not in determining the governing principle—that is invariable and runs through all of the cases,—but in applying that principle to the facts of a given case. For this purpose an examination of a multitude of decisions leads us to the conclusion that no rule, other than a very broad one, can be stated. A resemblance which would deceive an expert or very cautious purchaser may still give a right of action, but a resemblance which would deceive only an indifferent or careless purchaser gives no right of action. The true rule lies between these extremes, condemning what would be reasonably calculated to deceive the common or usual purchaser of the given article when exercising ordinary care."

Our last expression upon this subject in *Vittucci Co. v. Merline,* 130 Wash. 483, 228 Pac. 292, does not in any wise limit this rule.

It must at all times be borne in mind that in the *Frye* case there was no proof of specific instances of deception. The court further says:

"So here, there is no evidence that a single person has been deceived, and it seems clear that if the appellant's goods are ever to gain a title in the market it must be as 'Wild Rose' milk, and it will not and can-

not be as 'Carnation' milk. While there is in the case before us a manifest similarity in color scheme and grouping which could not be the result of mere coincidence, but evidences a design to imitate and appropriate respondent's taste in dress, which is not to be commended and may be justly characterized as ethically questionable, the differences are so many and so prominent as to negative a design to so imitate as to deceive by confusing identity or origin. The appellant's label could not deceive an intending purchaser of ordinary intelligence using reasonable caution, which is after all, both on reason and authority, the only practical test.''

Here there is proof that many were actually deceived. Respondents in their brief say:

''Our answer to this is that these cabs have operated side by side in Seattle for about eight months. During all that time the officers and agents of the appellant were industriously searching for evidence of such mistakes. Judged by their numbers alone, the witnesses they found were a poor reward for such industry. But when their testimony is analyzed it appears that either they had never seen one of the appellant's cabs, and consequently can scarcely be said to have been mistaken or deceived, or they knew when they entered that they were not patronizing a Yellow Cab, or they were exceedingly careless or utterly indifferent.''

How industrious appellant's agents were in seeking evidence we do not know, but when it is remembered that users of taxicabs are largely tourists and non-residents, that no one likes to make complaint, and few will do so if the result is likely to involve them in matters which may interrupt their movements or delay the execution of their own plans, the result of appellant's so-called search is rather more than might have been expected. That some had never seen appellant's cabs is beside the question. They knew of them through its advertising, and knew the appellant company

operated yellow cabs. That some were suspicious when they entered and convinced before they left the cab of one of the respondents that it was not appellant's cab, is likewise beside the question. The deception caused them to hail the cab or its driver, and but for the deception the cab would not have been entered. There was some carelessness on the part of the passengers in some instances.

"The true rule lies between these extremes, condemning what would be reasonably calculated to deceive the common or usual purchaser of the given article when exercising ordinary care." *Pacific Coast Condensed Milk Co. v. Frye & Co., supra.*

That rule must be applied in the light of what the common and usual seeker of taxicab service would ordinarily do. It must be borne in mind that the usual customer for taxi service is frequently a stranger in the place, that the majority of the taxicab business is done at night when details and appearances of the cab are not readily discernible, that a large part of the service is to and from depots and docks or hotels; that usually the passenger-to-be is in a hurry and intent mainly on reaching his destination promptly, perhaps with scant time to catch an outgoing train; and still more important, the incapacity of the ordinary person to observe or consider details or make comparisons unless his attention thereto be definitely invited, must also be remembered.

Notwithstanding the differences in detail (which had been pointed out to him by many witnesses during the preceding days of the trial) so clearly observed by the trial court when he made a personal inspection of the cabs of the respective parties, ranged side by side, in the clear light of day; conceding that the machines were of different manufacture and could have been quickly distinguished by one versed in such matters;

and not forgetting any of the details which did not correspond, pointed out by the several witnesses, yet still we are firmly convinced that as taxicab service is ordinarily sought by the ordinary purchaser of that service, respondents' cabs were calculated to and did deceive those seeking to engage appellant's cabs. Was the deception so caused such that equity will grant relief?

"One often sees the rule stated that the use of color or form or shape or any of the characteristics which may be used by all in the making of an article does not, of itself, amount to unfair competition. This is true in a sense, and untrue in another sense. The effect of imitating a single feature of an article varies with every case. No definite rule can be laid down. It depends on the conspicuousness of the feature copied." Nims on Unfair Competition (2d ed.), § 119, p. 238.

Cases where the simulation was by color only, or mainly, and in which relief by injunction was granted are numerous. *Yellow Cab Co. of Rhode Island v. Anastasi,* 124 Atl. (R. I.) 735; *Black & White Co. v. Weir,* 26 Pa. Dist. Rep. 650; *Yellow Cab Corporation of Rochester v. Korpeck,* 120 Misc. Rep. 499, 198 N. Y. Supp. 864; *American Yellow Taxi Operators v. Quinn,* 118 Misc. Rep. 499, 194 N. Y. Supp. 623; *Taxi & Yellow Taxi Operating Co. v. Martin,* 91 N. J. Eq. 233, 108 Atl. 763; *Yellow Cab Co. v. Creasman,* 185 N. C. 551, 117 S. E. 787; *Yellow Cab Co. v. Becker,* 145 Minn. 152, 176 N. W. 345; *Du Cros v. Gold,* 29 Times L. R. 163; *London General Omnibus Co. v. Felton,* 12 Times L. R. 213.

The *Frye* case, *supra,* recognized the general rule that primary colors as such may not be appropriated and monopolized, a rule we shall not here infringe upon, but points out that there are exceptions to the rule. The cases last above cited all, or practically all,

recognize that rule and do not enjoin against the use of a previously adopted color except only in so far as it is used to deceive. So here, respondents might have freely used yellow and black as fancy dictated, so long as they did not so use them as to deceive those members of the public seeking to employ appellants and cause their cabs to be engaged in place of those operated by appellant.

While generally injunction is a harsh remedy, as suggested by the trial court in his memo decision, yet we can see nothing harsh in a proper order here. Respondents will not be enjoined from pursuing their business in any proper way, but, as we view the case, they should be enjoined from in any manner representing that they operate a yellow cab for the Yellow Cab Company, or at all, and from using any cab or automobile so painted as to imitate appellant's cabs in their present form, in a manner likely to deceive appellant's patrons. Such an injunction takes nothing from respondents to which they have any right. It simply protects the public and protects the appellant in the business which it has established, but subject to the fair and open competition of the respondents and all others engaged in a like business. It would seem that at small expense the respondents' cabs can be speedily made so dissimilar to those of appellant that deception will be improbable, and impossible except in cases of gross negligence, against which the law affords no relief.

The judgment is reversed, with directions to grant a permanent injunction in harmony with the views here expressed.

FULLERTON, MAIN, MITCHELL, HOLCOMB, ASKREN, MACKINTOSH, and BRIDGES, JJ., concur.

PARKER, J. (dissenting)—I am unable to concur in the foregoing opinion. I think it erroneously gives to appellant an unlawful monopoly of the use of a common primary color, yellow, in the painting of its taxicabs. It evidently is only the use of this common primary color as the dominant color of respondents' taxicabs that renders them similar to appellant's taxicabs. In other respects they seem to me to be different in a degree fully equal to that which generally differentiates automobiles of different makes and different color schemes. I do not think appellant's rights are invaded to any greater extent than they would have been had the dominant color of its taxicabs been black and the dominant color of respondents' taxicabs been black. The use of yellow as a dominant color for a taxicab, or anything else, is as much the common property of everybody as is black or any other common color. I think respondents' motives in the use of this, what I conceive to be a common right, is a question with which we have no concern. I think the judgment ought to be affirmed.