CAMPBELL SOUP CO. et al. v. ARMOUR & CO.

Civil Action No. 6859.

District Court, E. D. Pennsylvania.

Sept. 8, 1948.

Robert T. McCracken and C. Russell Phillips, of Montgomery, McCracken, Walker & Rhoads, all of Philadelphia, Pa., for plaintiffs.

Harry D. Nims and Wm. M. Van Winkle, Jr., both of New York City, of counsel for Campbell Soup Co.

Edward S. Rogers and William T. Woodson, both of Chicago, Ill., of counsel for Carnation Co.

Walter J. Blenko, of Pittsburgh, Pa., William Clarke Mason and Thomas B. K. Ringe, of Morgan, Lewis & Bockius, all of Philadelphia, Pa., and George E. Leonard, of Chicago, Ill., for defendant.

GANEY, District Judge.

This is a suit by Campbell Soup Company and Carnation Company, complainants, to restrain the defendant, Armour and Company, from using a red and white device in any form approximating that of the present red and white banded label used on their products.

The complaint alleges that the plaintiff companies, Campbell and Carnation, have adopted identical trade-marks for their food and ingredients of food products; that each have done a large amount of business under the identical trade-mark in using the slogan, "Look for the red and white label", since the products of the plaintiffs bear red and white labels on their cans; that the red and white labels constitute a trade-mark which symbolizes the good will of each plaintiff and that their concurrent use of it in the United States and in foreign countries is the subject of an agreement between them; that the defendant, Armour and Company, has adopted a label for its products using white over red, and that the use of the same by the defendant is imitative of the trade-mark of the plaintiffs; that there is likelihood of confusion as to the source of origin of the defendant's products with the products marketed under the plaintiffs'

alleged trade-mark; that the defendant by using the label white over red has competed unfairly with the plaintiffs, and has been guilty of unfair trade practice. Accordingly, an injunction is asked by the plaintiffs to restrain the defendant from using the band white over red on its products, or in any form approximating that of its present label, as well as for an accounting of all profits derived by the defendant for the sale of merchandise under the present label complained of.

With respect thereto the Court makes the following

Findings of Fact:

1. The plaintiff, Campbell Soup Company, hereinafter called "Campbell," is a New Jersey corporation, with its principal place of business at Camden, New Jersey, and is a citizen, resident and inhabitant of the State of New Jersey.

2. The plaintiff, Carnation Company, hereinafter called "Carnation," is a Delaware corporation, with its principal place of business at Milwaukee, Wisconsin, and is a citizen, resident and inhabitant of the State of Delaware. The predecessor of Carnation was originally known as Pacific Coast Condensed Milk Company.

3. The defendant, Armour and Company, hereinafter called "Armour," is an Illinois corporation, with its principal office or place of business at Chicago, Illinois, and is a citizen, resident and inhabitant of the State of Illinois, and authorized to do business in the State of Pennsylvania and maintains a place for the transaction of business in the Eastern District of Pennsylvania.

4. On October 31, 1905, a trade-mark registration was awarded to Campbell for a period of twenty years, the description thereof in part being as follows: "The trade-mark of said corporation consists of a rectangular panel having an upper half of red and a lower half of white." The asserted mark was limited to soups and known as No. 47,153 and was renewed in 1925 and again in 1945, with no change either in the description or the goods. In the original application for the trade-mark, the description merely referred to "* * *

two bands, approximately centrally divided, one being white and the other red".

5. Trade-mark No. 47,154 was registered to Campbell in 1905 for baked beans with, in part, the following description: "The trade-mark of said corporation consists of a rectangular panel, the upper half of which is red and the lower half white, with the word 'Campbell's' appearing upon the upper half." This was likewise renewed in 1925 and again in 1945 with no change either in the description or the goods. In the original application the description did not specify whether the red or white was to be uppermost, and was later limited to the description above.

6. Trade-mark No. 48,664 was awarded to Campbell in 1906 for condensed soups and the description for it, in part, was as follows: "* * * a band, the upper half of which is red and the lower half white, with the word 'Campbell's' appearing in the upper half." In the original application there was no restriction as to which band was to be uppermost, but it was later limited by the description hereinabove.

7. Trade-mark No. 166,870 was registered in 1922 to Campbell for foods and ingredients of food, spaghetti being largely marketed thereunder. The description here provided for rectangular panels, the upper one red and the lower one white. Spaghetti has not been sold under this label since previous to 1939 although the registration was renewed without change in 1943.

8. Trade-mark No. 181,610, was registered in 1922 for certain canned goods, including tomatoes, corn, peas and beans, and while detailed the description provided for an upper panel of red and a lower one of white, specifies fleur-de-lis in gold, an upper border stripe of white and a lower border stripe of red.

9. All of the trade-mark registrations awarded to Campbell were under the Act of February 20, 1905, § 1, 33 Stat. 724, 15 U.S.C. 81, and were limited to panels of red over white after the original descriptions, sufficiently broad to admit of white over red, were amended.

10. The Carnation registration of September 18, 1900, No. 35,072, had an upper band of red with the word "Carnation" in script letters thereon, and a lower band of white, and three carnations centered on the label below the word "Carnation". The description, in part, provided:

"Different styles of lettering may be used, and the field or background may be varied, without altering the character of the trademark, the essential feature being the word 'Carnation'".

11. The Carnation registration trademarks here asserted are Nos. 239,791 and 282,053 for evaporated milk and condensed milk products and describe the panel as red over white, the uppermost being red and the lowermost being white. Application was made for the former on October 12, 1927 and for the latter on May 8, 1929.

12. The trade-mark registrations of Carnation were registered under the Act of February 20, 1905.

13. On the Campbell label the red panel has always been at the top while on the Carnation label it has likewise always been at the top except for a small number of labels used by it in two states in the southwest where it has been at the bottom. Campbell and Carnation both use a dark red; the Carnation red being slightly darker than the Campbell red. Campbell's principal product under its red and white label is condensed soups although it has been used for spaghetti, however, spaghetti as has been indicated, has not been marketed by Campbell since prior to 1939, since which time it has been sold under the label of "Franco American." Campbell's red and white labels carry the name "Campbell's" in white script on the red band.

14. Carnation's principal product under its red and white labels is evaporated milk, but it has been used on ice-cream and breakfast cereals also. Carnation milk labels carry the name "Carnation" on the red band in a position corresponding to the name "Campbell's" on the Campbell Soup can and in white script of a style similar to that used on the Campbell cans.

15. Campbell's business began on the Eastern seaboard and Carnation's business began on the Western seaboard, and both had achieved national distribution as early as 1911. Each of the plaintiffs distribute

their products through 95% of the retail stores in the United States.

16. For a period of 35 years, Campbell and Carnation concurrently used virtually identical red and white banding on their products, during a large period of which time the products were in national distribution and sold in the same stores.

17. After 35 years of such concurrent use, in January, 1934, Campbell and Carnation entered into an agreement, in writing, regarding their respective rights in the use of red and white banded labels, a similar agreement with respect to the foreign business of the two companies was made a year or two earlier. In general the agreement provided that Carnation should use the red and white labels on dairy and cereal products and Campbell was to use the labels on soups and all other food products. The division of the field between the two was made as a result of bargaining between the plaintiffs. The foreign agreement insofar as it operated in Germany was to be perpetual and for 100 years insofar as it operated over the rest of the world.

18. One of the effects of the agreement was that the plaintiffs agreed not to dispute the rights of the other whereas previous to the agreement they were entitled to oppose one another's applications for trade-mark registration.

19. Both plaintiffs for many years in magazines, newspapers and radio advertisements have been using the slogan, "Look for the red and white label" or its equivalent without protest from the other.

20. Although it has been using the red and white label since 1900 when the registration was obtained under the name of the Pacific Coast Condensed Milk Company, Carnation did not assert until 27 years later that the red and white background of the label constituted a trade-mark.

21. In trade-marks registered in Great Britain both plaintiffs disclaimed any right to monopolize a half red and half white label per se.

22. From 1929 to 1946, over a 17 year period, a concern in Spokane, Washington, called Broadview Dairy Company, used red and white labels, and sold its product in the same stores with Carnation and although Carnation in fact owned Broadview Dairy Company, there was nothing on the label to inform the purchaser that such was the fact, thus making it appear that the product came from a different maker. A like situation obtained for a period of three years and still continues in Portland, Oregon, with respect to Damascus labels. Although in fact owned by Carnation there is nothing on the container to show that Damascus is a Carnation product.

23. In 1942 and 1943 Carnation packed for and sold to National Co-Operatives, Inc., more than a quarter of a million cans of evaporated or condensed milk under "Co-Op" labels, which had the upper half white and the lower half red.

24. Red and white banded labels have been used in the food industry by concerns other than those involved in this litigation for various periods of time up to 40 years. On some of these labels of third party users, the red band is uppermost and in some it has been lowermost. The plaintiffs have at various times protested the use of some labels although 18 third party labels were deemed to be infringing by the plaintiffs, but they did not protest them, among which are "Ann Page" baking powder sold by the A. & P. Stores, a white over red label on the market for seven years, and VanCamp Sardines, sold by VanCamp Seafood Company, Inc., a white over red label, which has been on the market for 30 years. With respect to certain other third party labels, one or both of the plaintiffs have made some protest but upon refusal to change it, has acquiesced in the continued use of the label, among which are "Manchester" labels of Manchester Packing Company, and "Valamont" labels of National Fruit Canning Company. It is a fair inference to draw that companies as large as the plaintiffs' having representatives covering most of the retail stores at regular intervals for the purposes of sales promotion and to make advertisement layouts, acquire knowledge of the use of the third party labels in commerce.

25. The only foreign trade-mark registration that Campbell has shown to possess is British being in four colors, red, white, gold and black, and the registration is limited to the use of the colors "exactly as

shown in the representation on the Form of Application," wherein it is illustrated with the red uppermost and in the form of a rectangular panel, rather than an endless band.

26. The only foreign trade-mark shown to be possessed by Carnation is a British registration which provides that it gives "no right to the exclusive use of the device of a label with the upper part red and the lower part white".

27. Armour has been in business more than 80 years with more than 250 branches and conducts its business on a nation-wide scale, and has been using "Armour Star" or its equivalent as its trade-mark in its advertisements during this period of time.

28. Prior to the adoption of the labels herein complained of, the Armour labels were not well related one to another and were in part illegible. The accused labels were designed with a view to simplification and improvement, with particular reference to the need for legibility in self-service stores where the housewife selects her own purchases, and with a view to having one common badge which would identify all the Armour products so that the goodness and quality of one would help in selling the others.

29. The accused labels all have white and red as background colors, arranged in most instances as endless bands rather than in the form of a rectangular panel. In some cases the area of the red and white is the same. In other cases the ratio of red to white differs materially from fifty-fifty. In some cases the red and white bands are vertical, rather than horizontal. The reds employed differ from the reds used on the Campbell and Carnation cans. The Campbell and Carnation reds are stock "out of the can" colors, while the Armour red is specially blended.

30. The accused labels are members of a family of labels, some of which are white and red and others of which are white and green, white and blue, white and orange, white and yellow and red, white and green. Different Armour products, displayed under this variety of colors, are sold in the same stores.

31. The allocation of color to different products is generally on divisional lines.

Red was selected for Armour's Canned Foods Division because most of the commodities in that division are meats. Armour had used red and white labels, although in a different configuration, before it adopted the accused labels.

32. Although evaporated milk is marketed through Armour's Canned Foods Division, a pale blue label is used.

33. The Armour Star trade-mark is the dominant feature of all of the Armour labels. It is embodied in a distinctive badge consisting of a rectangular panel with rounded corners, maroon, in color, with the name "Armour" appearing thereon in distinctive type and with a colored star superimposed on and projecting from the upper right-hand corner of the rectangle. The color of the star varies with the product. The Armour Star badge is the basic theme of Armour advertising and is used on trucks, signs, business cards, business forms, etc.

34. The accused labels were designed, adopted and used in good faith with the intent of building up Armour's own good will and without any intent to trade upon or profit by the good will enjoyed by either plaintiff.

35. The Armour labels are distinctive at all distances at least up to 30 feet and are readily distinguished from the labels of either plaintiff, either in mass displays or intermingled, and whether right side up or upside down.

36. The accused labels were put into use in 1945. There is no evidence of passing off or of actual confusion in trade. No intelligent purchaser, using reasonable care, would be confused as between the goods of either plaintiff.

### Conclusions of Law

1. The court has jurisdiction in the premises.

2. The red and white banding on the plaintiffs' labels has not been used by them as a badge of exclusive origin, does not in fact function as a badge of exclusive origin, and gives no rise to any exclusive right.

3. Red and white banding is mere tasty dress which cannot be monopolized.

4. The agreement of January 6, 1934, between the plaintiffs is contrary to public policy and would be destructive of any trade-mark right in the premises if either of them had possessed such a right at the time the agreement was made.

5. The acts of Carnation in packaging Co-Op milk in red and white labels as well as permitting in use the Broadview and Damascus Labels without anything to indicate any proprietorship by Carnation in those labels, is inconsistent with plaintiff's claim of right here, and is indicative of the fact that they have considered red and white banding mere tasty dress.

6. The defendant has not been guilty of unfair competition either in the United States or abroad.

7. Defendant has not been guilty of trade-mark infringement either in the United States or abroad.

8. Plaintiffs' trade-mark registrations, insofar as they are addressed to the use of red and white bands or panels per se, are invalid.

### Discussion:

The question posed here is whether the adoption by Armour of a white band over a specially blended red band, forming their label, makes for confusion as to the source of origin of its products and thereby constitutes a trade-mark infringement of the Campbell and Carnation labels, and additionally whether the use by the defendant of this label makes it guilty of unfair trade practice as regards Campbell and Carnation.

These questions as to trade-mark infringement and to unfair trade competition in turn evoke the question of whether or not the red and white banding on labels such as we have in the instant case can be lawfully monopolized by the plaintiffs. In Leschen & Sons Rope Co. v. Broderick & Bascom Rope Co., 201 U.S. 166, at page 171, 26 S.Ct. 425, 426, 50 L.Ed. 710, the Supreme Court of the United States, while not in terms disposing of the question as to whether or not a color can constitute a valid trade-mark, says: "Whether mere color can constitute a valid trademark may admit of doubt. Doubtless it may, if it be impressed in a particular design, as a circle, square, triangle, a cross, or a star. But the authorities do not go farther than this. In the case of Re Hanson's Trademark, L.R. 37 Ch.Div. 112, in which a trademark was claimed for a red, white, and blue label, * * * The court remarked as follows: 'It is the plain intention of the act that, where the distinction of the mark depends upon color, that will not do. You may register a mark, which is otherwise distinctive, in color, and that gives you the right to use it in any color you like; but you can not register a mark of which the only distinction is the use of a color, because practically, under the terms of the act, that would give you a monopoly of all the colors of the rainbow.'" However, in Pacific Coast Condensed Milk Co. v. Frye & Co., 85 Wash. 133, 147 P. 865, at page 869, the Court dismissed the complaint of the plaintiff's now Carnation, wherein it sought to enjoin as unfair competition the use of labels having red and white banding with the white band uppermost, saying: "The primary colors are few, and as the evidence shows those suitable for light products, such as milk, are even more limited. To allow them to be appropriated as distinguishing marks would foster monopoly by foreclosing the use by others of any tasty dress." Again, in James Heddon's Sons v. Millsite Steel & Wire Works, Inc., 6 Cir., 128 F.2d 6, the court says, page 9: "The boxes and packages used by appellant for its goods were in common use and the narrow red stripe applied to such boxes and containers is not a trademark and cannot be exclusively appropriated. It is true that the most universal element may be appropriated as the specific mark of a manufacturer's goods if it is used and claimed with a sufficiently complex combination of other things as to make the combination unique. * * * The alleged trademark here is a colored label which gives a distinctive external appearance to the packages containing appellant's goods and one which indicates to some of the purchasing public that it contains appellant's goods, but does not point out distinctly the origin or ownership of the articles to which the label is affixed. Color, except in connection with some definite, arbitrary symbol or in association with some characteristics which serve to dis-

120

tinguish the article as made or sold by a particular person is not subject to trade-mark monopoly. Newcomer & Lewis v. Scriven Co., 6 Cir., 168 F. 621; Samson Cordage Works v. Puritan Cordage Mills, 6 Cir., 211 F. 603, L.R.A.1915F, 1107; Smith v. Walker, 57 Mich. 456, 22 N.W. 267, 24 N.W. 830, 26 N.W. 783; Dayton v. Imperial Sales & Parts Co., 195 Mich. 397, 161 N.W. 958."

 Accordingly, I am pursuaded that mere color by the use of red and white banding cannot be appropriated as a valid trade-mark without at the same time identifying it with some symbol or integers, and here neither plaintiffs have used mere red and white bands without identifying integers, such as the name "Campbell's" or the name "Carnation", upon which integers the purchasing public undoubtedly relies to identify the goods of the plaintiffs, one from the other. It would of necessity follow that two great companies marketing their products in almost all of the retail stores in the United States could not claim bands of red and white as distinctly original where they are referring to different characteristics and associations, such as are apparent when the two labels are compared, difference in names, in make-up, in other words, there being no definite association of color with the same design or characteristic. Further, if we make the assumption that the defendant's bands are imitative of the plaintiffs, the colors here are not referable to or associated with a design or characteristic peculiar to either of the plaintiffs, as the Armour's star is undoubtedly associated with the color red and white.

 The essence of the trade-mark is that it shall be a true badge of origin indicating that the contents to which it is affixed is the product of the trade-mark proprietor and no others, or as it is put by Nims, Unfair Competition and Trade-Marks, Fourth Edition, Vol. Two, p. 1289: "* * * it is vital to the existence of a trade-mark that it should be used by one and by only one concern. A trade-mark cannot serve two masters; it cannot identify two sources at the same time and remain a trade-mark."

 It is difficult to see in view of this well established principle how the red and and white banding can be claimed as a trade-mark by both Campbell and Carnation. This especially in view of the fact that for 35 years they existed side by side in nearly all the retail stores of the United States, and over that long period by extensive advertising the inference is strong that the consuming public looked to the name in combination with the color as its badge of origin to distinguish one from the other. To some degree corroborative of this is the fact that the agreement of 1934 entered into between the two plaintiffs does not base its adoption on confusion of origin of the products. This agreement while defining the rights between the contracting parties, it seems to me, could give no right as against third persons because the consuming public was no more aware of the agreement after its enactment than they were before, and confusion of origin, if any, as to the source of the goods, obtained as much before as after its adoption. California Fruit Growers Exchange v. Sunkist Baking Co., 7 Cir., 1947, 166 F.2d 971. In other words, the plaintiffs have obtained no exclusive right of user to the red and white band for the reason that each of them have used it and diluted of whatever of value there was in it by reason of the registration to both of them. The registration of a mark conveys no property right. Hanover Star Milling Co. v. Allen & Wheeler Co., 7 Cir., 208 F. 513. Ownership of the mark depends upon its adoption and use, not on its registration. Columbia Mill Co. v. Alcorn, 150 U.S. 460, 14 S.Ct. 151, 37 L.Ed. 1144. It seems to me it is very dubious reasoning to say that as to the consuming public there is now confusion as to the source of origin of the defendant's goods even though its band is white over red and is a specially blended red, distinguishable at 30 feet from either of the plaintiffs red, and yet there is no confusion as to source of origin on the part of the consuming public with respect to either Carnation or Campbell products even though the red in their bandings is more closely imitative one of the other than is the Armour red, merely because by agreement all has been taken care of. Accord-

ingly, I hold there is no trade-mark infringement under the Act of February 20, 1905, 33 Stat. 724, nor of the Lanham Act of July 5, 1946, 15 U.S.C.A. §§ 1051–1127, nor is there any contravention of the Pan-American Convention, nor is there any substance to the charge of trade-mark infringement abroad.

What has been said with respect to trade-mark infringement applies equally as well with respect to unfair competition. In Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 412, 36 S.Ct. 357, 360, 60 L.Ed. 713, the Court says: "This essential element is the same in trademark cases as in cases of unfair competition unaccompanied with trademark infringement. In fact, the common law of trademarks is but a part of the broader law of unfair competition. Elgin Nat. Watch Co. v. Illinois Watch Case Co., 179 U.S. 665, 674, 21 S.Ct. 270, 45 L.Ed. 365, 379; G. & C. Merriam Co. v. Saalfield, 6 Cir., 198 F. 369, 372; Cohen v. Nagle, 190 Mass. 4, 8, 15, 76 N.E. 276, 2 L.R.A.,N.S., 964, 5 Ann.Cas. 553, 555, 558." It would serve no useful purpose to review in detail the lengthy testimony covering the phase of unfair trade practices of the matter here at issue. Suffice it to say that a careful examination of the record very definitely persuades me that none here obtains. Taking into consideration the series of surveys which were conducted, the opinion of numerous advertising authorities, eminent psychologists, and the actual viewing of mass displays, I cannot say that there is any likelihood of confusion between Armour's goods and the goods of either plaintiffs. The testimony shows almost without contradiction that within 30 feet a purchaser would not confuse the defendant's goods with that of either of the plaintiffs. Beyond 30 feet and what was designated as the primary area, there was some testimony that a purchaser seeing the colors red and white in mass display would go to that portion of the store under the impression that the product was either the product of Campbell or Carnation. However, here again it seems to me that a purchaser would just as easily, if not more easily, at a distance of greater than 30 feet, be misled by a mass display of Carnation milk into thinking it was a Campbell product or vice versa, not knowing of the agreement of 1934, than he would be misled by a mass display of Armour products into thinking they were either Campbell or Carnation products by reason of the slight difference in color, as well as the change of their position. At any event, the realities of the situation must be taken into consideration, and as has been stated on numerous occasions, purchasers do not buy in a vacuum; and I am convinced that the difference in position of white over red, the difference in shading in the Armour's red over that of either Campbell or Carnation, the presence of the Armour Star on the label, plus the fact that the word Armour is spelled out in block lettering as differentiated from the Campbell and Carnation lettering, which is almost alike and in script, present sufficient differences to the buyer of ordinary intelligence as not to confuse him and hence the defendant is not palming off his goods as those of another.

Motion for an injunction and accounting denied.