## Pennsylvania Dutch Company, Inc.
## v. Pennsylvania Amish Co. et al. (No. 3)

*George B. Faller* and *Rod J. Pera,* of *McNees, Wallace & Nurick,* for plaintiff.

*James D. Flower,* of *Myers, Myers, Flower & Johnson,* and *James C. McConnon, John F. McNulty* and *Paul & Paul,* for defendants.

WEIDNER, J., August 26, 1974.—This is the fourth and final opinion in a series of opinions by this court addressing the above-captioned case. Therein, plaintiff, Pennsylvania Dutch Co., Inc., seeks injunctive relief from the alleged unfair trade practices of defendant corporation. Plaintiff has attempted to establish a right to relief by proving that, in entering the same line of business, defendant has chosen a corporate name and manner of marketing deceptively similar to that already employed by plaintiff, the result of which has been to create a likelihood that consumers will confuse defendant's products with plaintiff's established name and reputation. Over 700 pages of testimony have been recorded in four separate hearings, including the submission of some 245 exhibits. All relevant issues of law and fact have been briefed and rebriefed in an attempt to resolve the entangled and competing interests of these parties.

After a careful review of the entire record in this case, it is the opinion of this court that plaintiff has failed to show by convincing evidence that the conduct and practices of defendant actually confused and deceived or that it is reasonably likely that the average

purchaser will be deceived as to the source of defendant's goods. However, since there is convincing evidence to support the conclusion that defendant has considered altering the identifying characteristics of its labels in such a way as to cause a greater likelihood of consumer confusion, some delimitation of the privileged conduct of these parties is believed by this court to be in the best interest of the consuming public, and, therefore, the appropriate subject of an injunctive decree.

## FINDINGS OF FACT

1. Plaintiff, Pennsylvania Dutch Co., Inc., is a Delaware corporation, duly qualified to do business in Pennsylvania, with its principal offices located in Mount Holly Springs, Pa.

2. Plaintiff is the successor to Pennsylvania Dutch Candies, Inc., a Pennsylvania corporation which was engaged in the manufacture and distribution of candies, foods and novelties under the "Pennsylvania Dutch" and related labels, and from which plaintiff purchased all of the assets used in such business, including trademarks, trade names and good will, pursuant to an agreement of sale dated March 30, 1965.

3. The individual defendants were sole stockholders of Pennsylvania Dutch Candies, Inc., and were parties to the sales agreement of March 30, 1965, at which time defendant, Theodore A. Tichy, was the president of Pennsylvania Dutch Candies, Inc.

4. Pursuant to the terms of the sales agreement, two of the individual defendants, Theodore A. Tichy and Peter J. Shue, were employed by the plaintiff for a period of five years. The employment agreement of each of these two individual defendants contained covenants not to compete with plaintiff, which covenants, by their terms, expired December 31, 1971.

5. On or about July 29, 1971, defendant, Theodore A. Tichy, caused a Pennsylvania corporation to be formed under the name "Pennsylvania Amish Co., Inc."

6. Defendant, Pennsylvania Amish Co., Inc., is a Pennsylvania corporation having its principal offices in Mount Holly Springs, Pa.

7. On or about January of 1972 defendant, Pennsylvania Amish Co. , Inc., commenced doing business from Mount Holly Springs, Pa.

8. Theodore A. Tichy is, and always has been, the president and sole shareholder of Pennsylvania Amish Co., Inc.

9. Since approximately December 1952, plaintiff and its predecessors have been engaged in the manufacture and distribution of confectionery, food products and novelty items, and have, in the course of this business, utilized the Dutch motif in advertising and promotional materials as well as labelling, sales displays, and, in general, all material issued by the plaintiff in connection with its business.

10. Since January 1972, Pennsylvania Amish Co., Inc., has been engaged in substantially the same business as plaintiff, also utilizing the Dutch motif in advertising and promotional materials as well as labelling, sales displays, and all other facets of its business.

11. Both companies offer for sale substantially the same products in containers of identical size and shape and by way of similar display materials, each company purchasing its products for resale from the same suppliers.

12. Both plaintiff and defendant companies utilize systems of distribution common to their trade, engaging independent brokers and mail order catalogues. Each company has, however, directed its brokers to seek out gift shop retailers rather than the candy and

food store retailers more often sought by competitors in the field of confectionery and fine foods.

13. Each company solicits a substantial amount of its trade by means of a mail order price list similar in design and format to the other's. In comparison to plaintiff's, defendant's price list offers identical products at competitive prices and by way of substantially the same written text to describe them. Special "deals", by which plaintiff makes certain products available for sale together with accompanying display materials are also offered by defendant under identical conditions and by way of competitive prices.

14. Both plaintiff and defendant companies sell display merchandise to retailers, consisting of wooden cupboards, display racks and trees, and a "barber pole display" which are advertised in their respective mail order price lists. Where plaintiff has adopted a display item for use with a particular product or a class of products, defendant has generally adopted the same display for its competing products.

15. Both companies use display racks for their thin stick displays which are identical in over-all dimensions, color and finish of wood, each company identifying its rack by labelling it with the respective company name. The same similarity appears in the competing toffee racks, poly bag display trees, barber pole displays, the candy cupboards, and food cabinets. In each case the display item can be identified as to source by the respective company name embossed thereon.

16. When the display merchandise is presented to the consuming public it is stocked with containers of the respective company's products, which are themselves labelled with identifying name and trademark.

17. In many instances, Pennsylvania Amish Co., Inc. sells the same products as Pennsylvania Dutch

Co., Inc., in the same size and type of containers. Where plaintiff sells its product in a waxed tub, defendant has placed its in a waxed tub; where plaintiff has sold its product in a tall tin, defendant has placed its in a tall tin; where plaintiff has sold its product in a flat tin, defendant has placed its in a flat tin; and where plaintiff has sold its products cello-wrapped, defendant has placed its in cello-wrapping.

18. In some instances, where suppliers have offered different containers for their products, Pennsylvania Amish Co., Inc. chose the same containers used by Pennsylvania Dutch Co., Inc.

19. Defendant relies solely on its name and labelling to distinguish its product from those competing products of plaintiff.

20. Defendant's label is primarily pale blue or purple in color, prominently displaying a large pinkish-purple, squashed heart with the name "Pennsylvania Amish" printed in script across the heart and the name of the product printed under the company name. Other Dutch related marks, such as the silhouette of a horse and carriage and hex signs generally appear on defendant's various product labels.

21. Plaintiff's label is primarily pale yellow or white in color, displaying a small Dutchman's head in an upper corner of the label, with the name "Pennsylvania Dutch" printed in dark red or blue block letters, across the label and the name of the product printed under the company name. Other Dutch related marks, such as distelfinks and flowery designs, generally appear on plaintiff's various product labels.

22. No actual confusion by the ultimate consumer as to the source of the defendant company's products has been proven.

23. Two incidents of misrepresentation were proven. In each, a broker falsely indicated that he was

a representative of plaintiff while attempting to solicit an order for defendant's products. Neither broker succeeded in gaining an order. One retailer discovered the misrepresentation upon reading defendant's price list and noticing its distinct source. The other retailer admitted that he had relied solely on the broker's oral statement, and had not examined the price list until an authorized representative of plaintiff drew his attention to it. In each case, the retailer was initially deceived by the false statement of the broker and not be defendant's printed material.

24. Four retailers who had received defendant's price list in the mail testified to some initial confusion as to its source. Only one of those four actually placed an order by returning defendant's price list, thinking it to be plaintiff's. Daniel Green, a retailer in food from Newport News, Va., received defendant's price list, saw the name "Pennsylvania" and set it aside to read later. Mr. Green's wife later drew his attention to the fact that defendant's price list was from a company other than plaintiff. Aileen Gaterman, a flower and gift shop operator from Verden, Ill., initially filed defendant's price list in a drawer marked for plaintiff's lists. Later, when she attempted to use the list, she discovered it to be from Pennsylvania Amish Co., Inc. instead of Pennsylvania Dutch Co., Inc. Sara Stengle, in the bakery and candy business, from Ambridge, Pa., said that she noticed the difference in defendant's and plaintiff's names and first thought that plaintiff had changed its name, but was told differently by a sales lady representing Pennsylvania Dutch Co., Inc. Elizabeth Jochimsen, a candy store employe from St. Louis, noticed that defendant's mailer had a name and image, including defendant's squashed heart, different from the marking of plaintiff's price list, but she ordered from defendant's list, believing it to be plaintiff's,

because she didn't believe there would be two candy companies in the same Pennsylvania town.

25. No other evidence of actual confusion of source by either retailer or consumer was offered.

26. Plaintiff has entered into a consent decree authorizing one other competititor, Keppel's, Inc., of Lancaster, Pa., to use the words "Pennsylvania Dutch", and Pennsylvania Dutch or Dutch designs, symbols and motif in connection with the sale of goods by that competitor, without the exercise of quality control over those goods by plaintiff.

27. The result of this agreement has been the appearance of candy products of Keppel's, Inc., in polyethelene bags similar to those of plaintiff, and, now, defendant.

28. In those instances where Keppel's, Inc., offers competing products, the labelling of Keppel's bags appears more confusingly similar to plaintiff's corresponding bags than do defendant's competing polybagged products.

29. In testimony taken July 10, 1972, defendant Theodore A. Tichy admitted that he was currently considering changing the background of his company's labels from their pale blue to a "glossy tan", much more similar to plaintiff's pale yellow label. Tichy explained that no business necessity other than the desire to change to a brighter color prompted this consideration.

## DISCUSSION

Plaintiff seeks to enjoin defendant from competing in the candy, fine food and confectionery business under its present corporate name, Pennsylvania Amish Co., Inc., and by way of defendant's currently employed trade names and trademarks. Additionally, plaintiff asks that defendant be enjoined from using the Pennsylvania Dutch or Amish motif, and any mark

heretofore used by plaintiff, in connection with the selling of defendant's products.

Plaintiff's right to this relief is, of course, dependent upon his proving that, as a result of defendant's business conduct, there is a real likelihood that the average purchaser will confuse defendant's products with plaintiff's established name and reputation. All that is necessary is that the court find from the evidence that the name (Pennsylvania Amish), or the conduct and practices of the defendant actually confused and deceived or that it is reasonably likely that the average purchaser will be deceived; possibility that purchasers will be misled is not enough: Peters v. Machikas, 378 Pa. 52, 59 (1954); KoolVent Metal Awning Corporation of America v. Price, 368 Pa. 528 (1951); see also, Dutch Pantry, Inc. v. Shaffer, 396 Pa. 102 (1959). This standard is predicated on judicial recognition of the balance to be struck between the public interest in free competition and the protectable interests of the individual businessman and of the purchaser who discriminates by product source. Thus, while a competitor may, subject to patent, copyright and trademark law, imitate his rival's business, including any unpatented product, protection afforded to competition does not countenance usurpation of a competitor's investment and toil by any representation, however unintentional, that the product offered is that of one's rival: Jessar Manufacturing Corporation v. Berlin, 380 Pa. 453 (1955); Stroehmann Brothers Company v. Manbeck Baking Company, 331 Pa. 96 (1938); Pennsylvania Central Brewing Co. v. Anthracite Beer Co., 258 Pa. 45 (1917); accord, Sears, Roebuck & Co. v. Stiffel Company, 376 U.S. 225 (1964); Compco Corporation v. Day-Brite Lighting, Inc., 376 U.S. 234 (1964).

In an action for unfair competition, plaintiff has the burden to prove by whatever means he can that de-

fendant's conduct has caused, or is likely to cause, confusion. He may discharge this burden by proving actual confusion, for there is no greater proof of the likelihood of an occurrence than proof of the occurrence itself. See Goebel Brewing Company v. Esslingers, Inc., 373 Pa. 334 (1953). Where insufficient proof of actual confusion exists, plaintiff may rely on experts to testify as to the effect that the conduct and business practices of the parties is likely to have on the average consumer. See Kellogg Company v. National Biscuit Company, 305 U.S. 111 (1938); Campbell Soup Co. et al. v. Armour & Co., 81 F. Supp. 114 (E. D. Pa., 1948). Thirdly, and finally, plaintiff may choose to rely on the fact-finding ability of the court itself to determine from an examination of exhibits and testimony what, if any, likelihood exists that the average purchaser will be deceived as to the source of defendant's goods.

Although the third approach appears to be the least desirable means to support a sound decision, plaintiff, whether because of insufficient evidence or otherwise, has chosen that approach to be his own. Thus, a heavy burden is rested on this court to predict the behavior of a class of individuals, including retailers and consumers from the Pennsylvania Dutch region, well-schooled in the wide-spread use of the Dutch motif, and those as far removed from that area as defendant's marketing may reach.

The result of this process must, in the final analysis, be that of an educated guess. Nevertheless, we do not proceed without some guidance. A substantial number of common-law decisions, both in the Federal courts[1]

---

[1] See Goebel Brewing Company v. Esslingers, Inc., 373 Pa. 334, 340 (1953), where it discusses the development of the common law of unfair competition in both the Federal and State courts; and Surgical Supply Service, Inc. v. Adler, 321 F. 2d 536, 537 (3rd Cir., 1963).

and in Pennsylvania, along with well-recognized sections of the Restatement, Torts, have acted to define what interests of plaintiff may be protected from the infringement of competitors and what conduct of defendant may be considered so prejudicial to those interests as to merit proscription.

In this regard, Restatement, Torts, §711, et seq., offers the most appropriate framework for this discussion. Section 711 of the Restatement focuses on the conduct of defendant and sets forth three categories of behavior, any one of which, if engaged in by defendant, will entitle plaintiff to equitable relief. Subsection (a) describes the case of "passing-off", where one fraudulently markets his goods or services as those of another, by false representation that he is the other or the other's agent or successor, or that the goods which he markets are produced or distributed by the other. Under this category, plaintiff did offer the testimony of two retailers who had allegedly been approached by brokers claiming to represent Pennsylvania Dutch Co., Inc., when, in fact, one carried the Pennsylvania Amish line of products and the other left behind a Pennsylvania Amish mail order price list.

Witness Agnew testified in the July, 1973 hearing that a Mr. Miller, whom Agnew knew to be employed by an Ohio brokerage house carrying "wood products and china ware" as well as the "Pennsylvania Amish gourmet foods line", approached Agnew at his Tionesta, Pa., gift shop and presented the broker's entire line of products to Agnew, including what Agnew heard to be "the Pennsylvania Dutch foods and gourmet line". Agnew asked the broker for a catalogue of the Dutch line of goods and was provided with a Pennsylvania Amish price list, which the broker told Agnew he could not sell from anyway. On cross-examination Agnew admitted that he knew the term "Pennsylvania

Dutch foods and gourmet line" was used by advertisers and the public, generally, as a generic term, descriptive of foods and candy items from the Pennsylvania Dutch area, and not necessarily those of plaintiff company.

Agnew's testimony was brief and inconclusive as to whether an actual attempt had been made by this independent broker to pass off the goods of defendant as being distributed by plaintiff, Pennsylvania Dutch Co., Inc. No other evidence was offered to explain or corroborate that of the witness Agnew.

Witness Samuelian testified at the July 10, 1972, hearing, to an unidentified individual who reportedly stopped at Samuelian's restaurant in West Chester, Pa. Claiming to be a representative of Pennsylvania Dutch Co., Inc., the individual left Samuelian with a Pennsylvania Amish brochure which Samuelian put aside until he was visited by his regular Pennsylvania Dutch salesman. It was then that Samuelian actually examined the brochure and saw it to be that of Pennsylvania Amish. No evidence was offered as to who had left the Pennsylvania Amish brochure. No conclusion can be drawn from the evidence on record as to whether he was, in fact, an agent of defendant company. Taken by itself, this incident appears insufficient to establish an attempt on the part of defendant to pass off his goods as those of plaintiff, Pennsylvania Dutch Co., Inc.

There is no other evidence on the record related to an allegation of "passing-off" in line with the definition of Section 711(a) of the Restatement, Torts. The evidence at hand being thus inconclusive, plaintiff has failed to establish an entitlement to relief under category (a) of section 711. This does not dismiss the possibility, however, that defendant may, by his con-

duct, have created a situation likely to cause confusion, and thus facilitate future deception by "passing-off".

Subsections (b) and (c) of Restatement, section 711, focus on unpriviledged imitation of the trade name, trademarks and physical appearance of plaintiff's products. Plaintiff has attempted to build his case from each of these sections, emphasizing the over-all impact of defendant's conduct on the average consumer. Plaintiff has argued that defendant's packaging, labelling and marketing is so similar to that of plaintiff's as to confuse the public and to prey upon the plaintiff's good will and established reputation.

An examination of the record in this case affords no doubt that defendant has imitated plaintiff's over-all appeal to the consuming public. By relying on advertising and labelling designed to convince the purchaser that he is buying a product of the Plain People of Pennsylvania, loosely referred to as dutch or amish, defendant has managed to displace a portion of plaintiff's antecedent business, and thereby gain a market. Indeed, there have been witnesses who testified that, in their minds, the terms "Pennsylvania Dutch" and "Pennsylvania Amish" have the same generic or descriptive meaning and, for that reason, have a confusingly similar appeal to the purchaser.

The law is clear, however, that absent source confusion, mere imitation of certain successful features in another's product is not unlawful: Surgical Supply Service, Inc. v. Adler, 321 F. 2d 536 (3rd Cir., 1963) (similar mail order price lists not enough); Stroehmann Brothers Co. v. Manbeck Baking Co., 331 Pa. 96 (1938) (imitation of the "master design" of plaintiff's label not enough); Quaker State Oil Refining Co. v. Steinberg, 325 Pa. 273 (1937) (defendant's use of name "Quaker City" on identical products not enough); KoolVent

Metal Awning Corp. of America v. Price, 368 Pa. 528 (1951) (use of name "Coolray" on metal awnings not enough). Cf. Goebel Brewing Company v. Esslingers, Inc., 373 Pa. 334 (1953) (sale of "Goblet" beer in steinie bottles of identical size and shape and with labels colored similar to those of plaintiff's "Goebel's" beer, together with proof of actual passing-off in one-half the instances investigated, held sufficient to establish plaintiff's right to relief). The features imitated must be those characteristics of plaintiff's materials which distinguish his company from others in the trade: Surgical Supply Service, Inc. v. Adler, supra; Stroehmann Brothers Co. v. Manbeck Baking Co., supra; Campbell Soup Co. et al. v. Armour & Co., 81 F. Supp. 114 (E. D. Pa., 1948). In addition, where the names and marks imitated are of a common or generic usage, it must be shown that, as the term is employed, the primary significance of the term in the minds of the consuming public is to identify the producer, and not merely the product: KoolVent Metal Awning Corp. of America v. Price, supra; Quaker State Oil Refining Co. v. Steinberg, supra; Kellogg Co. v. National Biscuit Co., 305 U.S. 111 (1938).

This last requirement addresses the issue of so-called secondary meaning. The comment to subsection (b) of Restatement, Torts §741, explains the sense of this requirement, where it reads:

"An imitation [of the physical appearance of another's goods] is unpriviledged under the conditions stated in this clause for substantially the same reasons as those which make the imitation of trade-marks or trade names unprivileged, namely, the likelihood that prospective purchasers will be deceived and that diversion of trade will result from such deception. TO SUBJECT THE ACTOR to liability under the rule stated in this clause, the imitated feature must be

regarded by prospective purchasers as identifying the source of the product. IT IS NOT SUFFICIENT that the feature is pleasing to them and they desire goods having it. If that is the sole significance of the feature, competition would be unduly hampered by the prohibition of imitation. IT IS ONLY when the feature in fact identifies source and the imitation is likely to deceive prospective purchasers who care about source that the imitator is subject to liability." [2] (Emphasis added)

Plaintiff's arguments against this requirement are untenable in light of the fact that plaintiff has failed to offer both sufficient proof of actual confusion or to offer expert testimony to support a real likelihood of consumer confusion. Furthermore, by examining the exhibits in this case, it is clear that defendant has not copied the distinctive source-identifying features of plaintiff's product labels or advertising materials. Instead, defendant's heart-shaped logo with company name prominently appears on all its products and trade circulars, except those products marketed by independent distributors.

In the one instance where defendant's products appeared without a label, they were pictured in the 1973 catalogue of Bachman's, Inc., a distributor of "Dutch" products, in the generic sense of that word. Evidently, defendant's products had replaced that line of plaintiff's products which Bachman's had carried the year before, but no identification was made as to any other source of the products than that of Bachman, the catalogue-distributor. None of the products offered in the Bachman catalogue were identified as those of any company but Bachman's, Inc.; and, in fact, plain-

---

[2] It is significant to note that this passage of the Restatement, Torts, was not modified by tentative draft no. 8 to the Restatement 2d, Torts, which addressed original sections 711 through 756.

tiff's product had itself appeared in the same catalogue the year before without identifying label.

We are thus brought to the core issue for determination. Does defendant's use of the name "Pennsylvania Amish" together with its heart-shaped logo and complementary label invade any protectable interest of plaintiff in its name and characteristic labelling? We think not.

No secondary meaning in the term "Dutch" or in the use of the Dutch motif in connection with plaintiff's business has been established. Plaintiff can make no claim to being the first to use Dutch related terminology or a Dutch motif in the food and candy trade of Pennsylvania, especially in light of the 1970 suit between plaintiff and Keppel's, Inc. of Lancaster, Pa. By way of a consent decree in that case, plaintiff has authorized Keppel's, Inc., a competitor in the candy industry of Pennsylvania, Keppel, NT-3, p. 161-163, to use the words "Pennsylvania Dutch," and Pennsylvania Dutch or Dutch designs, symbols and motif in connection with the sale of its goods. The result of this agreement has been the appearance of candy products of Keppel's, Inc., in polyethelene bags similar to those of plaintiff and, now of defendant. A comparison of defendant's exhibits numbered t-9c, 13, 15, and 19 with those numbered 22, 14, 16, and 20 reveals the almost perfect similarity that Keppel's bags bear to those of plaintiff. Defendant's competing bags, exhibits numbered 38(a), 38(b), 38(f), and 38(c) display a label much less similar to plaintiff's than do the bags of Keppel's, Inc. This conclusion is supported by the testimony of witness Agnew, who stated that, by comparison, the labelling of Keppel's Sassafras bag would appear, to Mr. Agnew's customers, more confusingly similar to plaintiff's Sassafras bag than would

the label of defendant's competing Sassafras bags; Agnew, NT-3, p. 67.

Clearly, plaintiff has given up any protectable interest that might have been his by sharing his name and marks with a competitor in the same field of industry. Just as "a trademark cannot serve two masters," neither can a name or other identifying marks be claimed for the exclusive use of one of two competitors where it is, in fact, consensually employed by both. See Campbell Soup Co. et al. v. Armour & Co., 81 F. Supp. 114 (E. D. Pa., 1948), applying Pennsylvania law; also, Stroehmann Brothers Co. v. Manbeck Baking Co., 331 Pa. 96 (1938) (proof of originality of marks as well as deceptive similarity is essential).

Regardless of the arrangement between Keppel's, Inc. and Pennsylvania Dutch Co., Inc., however, plaintiff has failed to prove the existence of any secondary meaning in the name "Pennsylvania Dutch" or in its use of the Dutch motif in connection with its business.

The requisites of proof of secondary meaning were defined by our Supreme Court in the case of Zimmerman et al. v. Holiday Inns of America et al., 438 Pa. 528, 535 (1970), wherein the court explained: "The term 'secondary meaning' encompasses the situation where people in the trade or purchasing public come to think of a word or name as standing for the business of a particular owner." The Pennsylvania Supreme Court went on to grant Zimmerman an exclusive right to use the word "Holiday" within a 22-mile radius of Harrisburg, where he had established, by means of testimony of people whose business brought them frequently to Harrisburg, that the word "Holiday" was identified primarily with Zimmerman's business, in that area. By that same decision, how-

ever, the Pennsylvania Supreme Court denied Zimmerman any exclusive right to use his corporate name elsewhere in the State, citing as one of its reasons, Zimmerman's failure to produce adequate testimony as to the reputation of his corporate name outside Harrisburg:

"Moreover, the witnesses chosen by Zimmerman's counsel to give testimony were not chosen at random or by any scientific method. Only thirty witnesses were brought in, seven from the Philadelphia area, twenty-two from the Pittsburgh area and one from Harrisburg. There was no indication that they were representative of the estimated 5 to 8 million people who live along the Pennsylvania Turnpike. There was no indication of the total number of people who use the Pennsylvania Turnpike, and the geographic source for these travellers.": Zimmerman et al. v. Holiday Inns of America et al., Id. at 537.

Plaintiff's evidence in the instant case suffers the same deficiencies. In order to meet its burden of proving that the name "Pennsylvania Dutch" had come to have a secondary meaning as standing for its business, plaintiff offered only the following evidence:

(1) Testimony by plaintiff's president that plaintiff had extensively advertised its business under the name "Pennsylvania Dutch" over the northeast quadrant of the United States in the five-year period before defendant entered business;

(2) Testimony by two officers of national trade associations that to them "Pennsylvania Dutch" means candies and products from plaintiff, Pennsylvania Dutch Co., Inc., of Mount Holly Springs, Pa. (These same officers testified that they knew of no other company using the name "Pennsylvania Dutch" or the accompanying motif.);

(3) Testimony of four retailers that they had confused defendant's mail order price list with plaintiff's self-addressed mailer.

Looking first at the four retailers, finding of fact number 16, herein, has briefly outlined the deficiency of that evidence. Although each of the retailers testified that he or she had at some point, after receiving defendant's mailer, confused it with plaintiff's price list, each witness admitted that he or she had noticed differences in the name and company heading upon closer examination. Mr. Green, who had put the price list aside without examining it, later noticed it to be that of defendant when his wife called the mailer to his attention. Aileen Gaterman discovered the difference in name and label when she first attempted to use defendant's price list. Sarah Stengle thought that plaintiff had adopted a different company name when she first saw defendant's price list. Elizabeth Jochimsen, the only one of the four retailers to actually place an order, and the only witness in this case who testified to placing an order with defendant company thinking it to be plaintiff, did so because she didn't believe that two candy companies such as plaintiff and defendant would exist in the same town, even though she too had noticed the difference in name and company heading on defendant's mailer.

All four witnesses actually recognized the company heading of defendant's mailer to be significantly different from that of plaintiff's mailer. Only one of the four acted in reliance on defendant's price list being from Pennsylvania Dutch Co., Inc. This testimony, therefore, presents the inescapable conclusion that, regardless of what significance plaintiff's name has acquired, defendant's name is not so similar to plaintiff's as to breed confusion. Thus, although it has been said that confusion implies secondary meaning:

Spangler Candy Co. v. Crystal Pure Candy Co., 235 F. Supp. 18, 27 (N. D. Ill., 1964), none can be inferred here: Miscellaneous, Inc. v. Klein's Fashions, Inc. et al., 452 Pa. 62 (1973).

There was, additionally, some testimony of mis-delivery of mail and freight targeted for one of the two companies. As was testified to by witness Keppel, however, such occurrences are not uncommon to the trade. Pennsylvania courts have recognized that such incidental confusion does not create an implication of secondary meaning or confusion of source. See Miscellaneous, Inc. v. Klein's Fashions, Inc. et al., supra.

Plaintiff's more direct testimony of secondary meaning, by the two officers of multi-State trade associations, suffers from the same infirmities as did the testimony of Zimmerman's witnesses in the case quoted above. There is no indication that plaintiff's two witnesses were representative of the customers who frequent the market in which Pennsylvania Dutch Co., Inc. and Pennsylvania Amish Co., Inc. compete. Mr. Sullivan of the Retail Confectioners' International Association testified that he knew of no companies other than plaintiff using the Pennsylvania Dutch name or motif, and specifically testified that he had never encountered any of the companies defendant presented as also using the Dutch name or motif. Yet, defendant presented the testimony of Robert Keppel, of Keppel's Inc., who is past treasurer and president and was, at the time, current Chairman of the Board of the Pennsylvania Manufacturing Confectioners Association, having 160 Pennsylvania members and which is itself a member of the National Candy Whole-salers Association. Mr. Keppel testified to his own company's and others' distribution of candy products under the Dutch name and motif and also testified to

the generic significance of the term "Pennsylvania Dutch" in the trade. One is left to wonder whether Mr. Sullivan had ever visited Pennsylvania.

Jean Frank, of the National Association for the Specialty Food Trade, like witness Sullivan, also appeared as one of somewhat limited knowledge in the confectionery trade of Pennsylvania, unaware of all of the other companies dealing in the Pennsylvania Dutch motif. She appeared, like Sullivan, to be so focused on interest in her particular organization, as to be unaware of all but members of her organization. She apparently associated the term "Dutch" and its theme with that which is closest to her organization's concern, namely its membership.

These two witnesses did not render an objective or adequately characteristic sampling of opinion in the market place where plaintiff and defendant compete. Conversely, witness Keppel's informal poll at the National Candy Wholesalers' convention in 1972, although in no way a scientifically selected indicia, was, at least, a random sampling of the reaction of those who compete in the same market as the parties to this suit, and is an example of the type of evidence plaintiff has failed to bring forth on this issue.

Plaintiff's final, most significant effort to establish secondary meaning was by way of the testimony of its own employe, Lincoln Warrell, as to the extent of Pennsylvania Dutch Co. sales and advertising during the five-year period immediately preceding the entry of defendant into the market place. Although this testimony was convincing beyond question, Pennsylvania courts have held, time and again, that advertising alone is not sufficient to establish the requisite secondary meaning: Miscellaneous, Inc. v. Klein's Fashions, Inc. et al., 452 Pa. 62, 65 (1973); Quaker State Oil Refining Co. v. Steinberg, 325 Pa. 273, 281

(1937). Cf., Pennsylvania Central Brewing Co. v. Anthracite Beer Co., 258 Pa. 45 (1917).

Failing proof of secondary meaning, plaintiff can claim no exclusive right to the use of the term "Dutch" or the Dutch motif in connection with the candy and fine foods industry of Pennsylvania. This does not mean, however, that defendant may imitate plaintiff's label and markings in an effort to facilitate the passing-off of its goods as those of plaintiff by retailers and others connected with the trade. See Goebel Brewing Company v. Esslingers, Inc., 373 Pa. 334 (1953). Indeed, defendant has a common-law duty, owing to plaintiff, to exercise its rights to use the Dutch motif and related names and marks in a manner which reasonably distinguishes its product from that of plaintiff: Kellogg Co. v. National Biscuit Co., 305 U.S. 111 (1938); Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F. 2d 569 (2nd Cir., 1959); Quaker State Oil Refining Co. v. Steinberg, 325 Pa. 273 (1937).

The impact of defendant's label on the selective mind of the average purchaser has been discussed at length, by this court, in its opinion and order of January 16, 1973. No purpose would be served by reviewing that reasoning now. The evidence admitted since then has done little to change the opinion of this court: (1) that any similarity which exists between plaintiff's and defendant's names and labels results from the wholesome image of the Pennsylvania Plain People that each suggests to the purchaser, and (2) that Pennsylvania Amish Co., Inc. has (a) by choosing its un-patented heart-shaped design as a trademark distinct from plaintiff's Dutchman's head trademark, and (b) by choosing background coloring significantly different from plaintiff's pale yellow or white label, sufficiently distinguished its label from that of plaintiff

as to successfully identify its products as its own to any prospective purchaser who cares about source.

In addition, defendant, Theodore Tichy, has sent a personal letter to prospective retailers, which he has also enclosed in his company's mailers, describing his company and its independence from Pennsylvania Dutch Co., Inc.

By so acting, defendant has satisfied the duty of a second comer in the field to refrain from doing anything that will unnecessarily create or increase confusion between his goods or business and that of his rival. In accord: Stroehmann Brothers Co. v. Manbeck Baking Co., 331 Pa. 96 (1938) (emphasizing prominent features of labels); Quaker State Oil Refining Co. v. Steinberg, 325 Pa. 273 (1937) (emphasizing color of labels and containers); Surgical Supply Service, Inc. v. Adler, 321 F. 2d 536 (3rd Cir., 1963); Kellogg Co. v. National Biscuit Co., 305 U.S. 111 (1938).

Accordingly, defendant's present conduct in competition with plaintiff is lawful and in the best interest of the consuming public. There is, however, one final concern which moves this court to the brink of equitable relief. That is the present intentions of defendant to deviate from his past conduct.

In an area where the law is engaged in predicting the likelihood of consumer confusion as well as the consequences of defendant's conduct in a market place controlled by independent retailers, it becomes necessary to consider the probable effect of defendant's intended conduct. By the following colloquy on cross-examination, defendant, Theodore Tichy, has admitted his consideration to change the blue background of the Pennsylvania Amish label to a "glossy tan", much more similar to plaintiff's pale yellow label:

"The court: Did you consider recently a change from blue?

"A. No.

"Q. You did not consider recently changing the background from blue?

"A. No.

"Q. Did you consider recently using another background on point of purchase materials?

"A. We are constantly endeavoring to improve our labels.

"Q. But your testimony to me is that you have not considered recently changing the background on the point of purchase materials?

"A. We have considered changing . . . to improve our packages constantly.

"The court: I am going to take a recess and I would like you to instruct this witness to answer the question and not evade the question. Court is in recess. Court recesses at 3:30 P.M., resumes at 3:50 P.M., E.D.T.

"Q. Mr. Tichy, I believe I left off by asking you had you recently considered changing the blue background on your point of purchase materials?

"A. A few weeks ago, we did, yes.

"Q. To what color?

"A. We were considering a color that wouldn't be as morbid as the blue, blue is . . .

"Q. To what color were you considering changing?

"A. Sort of a glossy tan color."

Although courts in the past have prevented the monopolization of a specific color as a trademark in and of itself (Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F.2d 569 (2nd Cir., 1959); Campbell Soup Co. et al. v. Armour & Co., 81 F. Supp. 114 (E. D. Pa., 1948)), the color of packages and labels have been recognized as significant in distinguishing one maker's product from another's, especially where the

company names share some similarity (Quaker State Oil Refining Co. v. Steinberg, 325 Pa. 273 (1937); Goebel Brewing Co. v. Esslingers, Inc., 373 Pa. 334 (1953)), or where the coloring itself has attained a secondary meaning: Pennsylvania Central Brewing Co. v. Anthracite Beer Co., 258 Pa. 45 (1917).

Because of the similarity of suggestion in the names "Pennsylvania Dutch" and "Pennsylvania Amish" and because defendant has chosen to imitate nearly every facet of plaintiff's business, to include style of marketing and appeal to the consuming public, this court concludes that, where defendant depends exclusively on its name and label to distinguish its goods from those of plaintiff, the color of defendant's label and packaging should, in the future, conform to defendant's present use of blue or purple, as contrasted to plaintiff's continued use of pale yellow or white.

Accordingly, the following conclusions of law and order of the court are hereby rendered by this court.

## CONCLUSIONS OF LAW

1. Plaintiff has no exclusive rights nor any protectable interest acquired on the basis of secondary meaning due to its advertising and promotion, with respect to any of the words "Pennsylvania Dutch", "Dutch", "Amish", the Pennsylvania Dutch designs and symbols, and the Pennsylvania Dutch and Amish motifs.

2. Plaintiff, by entering into an agreement authorizing at least one other competitor to use the words "Pennsylvania Dutch", the Pennsylvania Dutch designs or Dutch designs, symbols and motifs in connection with the sale of goods by that competitor without the exercise of quality control over those

goods, has abandoned any protectable interest plaintiff may have had in the exclusive use of those names, designs or symbols.

3. Neither the name Pennsylvania Amish nor the word "Amish" as used by defendants is deceptively similar to plaintiff's name Pennsylvania Dutch Co.

4. Defendant's use of its own present labels, price lists, display materials and other items together with its current marketing practices serve adequately to distinguish its goods from those of plaintiff.

5. No likelihood of confusion as to source between plaintiff and defendant companies, either by those in the trade, or by the purchasers or consumers of their goods, exists at the present time.

6. No unfair competition by defendants against plaintiff currently exists.

7. Defendant's imitation of plaintiff's business by distribution of the same or similar products, packaged in identical containers, marketed by similar techniques and offered to the same consumer public, has created a situation in which a slightly greater degree of similarity in company names and/or labels than that which currently exists would result in the likelihood of consumer confusion.

8. Defendant's use of product labels with a blue and purple background, distinct from plaintiff's use of yellow and white, is of vital importance to the successful identification of defendant's products in the market place.

9. A change of label from that described in finding of fact no. 24, herein, to one whose color and/or distinctive features more closely resemble those of plaintiff's label, described in finding of fact no. 25,

herein, would so reduce the distinctive impact of defendant's labelling as to lead the average consumer, mindful of source, to confuse defendant's product with that of plaintiff.

10. Appropriate injunctive relief should be granted.

11. Plaintiff's request for an accounting for profits should be denied.

## DECREE NISI

And now, August 26, 1974, at 3 p.m. upon consideration of the foregoing, it is ordered, adjudged and decreed as follows:

That so long as plaintiff, its successors or assigns, is engaged in the fine food and confectionery business, by way of its currently employed name, marks and labels, and so long as defendant, its successors or assigns, competes in the same business by appealing to the same average consumer as does plaintiff by way of its currently employed name, marks and labels, defendant company, its successors and assigns are enjoined from changing the coloring and/or other distinctive features of its labels and identifying marks from those described by finding of fact no. 24, herein, to others more closely resembling the corresponding labels and marks of plaintiff, as described in finding of fact no. 25, hereinabove.

The prothonotary of Cumberland County is directed to file this adjudication, enter the within decree nisi, give notice to the parties or their counsel of record as provided by the rules of equity practice in Pennsylvania, and, unless exceptions are filed to this decree nisi within 20 days after said notice, this decree shall be entered as a final decree by the prothonotary.